247 F.3d 360 (2nd Cir. 2001)
 Peter B. Hoffman, Regional Director of Region 34 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellant,
v.
Inn Credible Caterers, Ltd., Respondent-Appellee.
 Docket No. 00-6235
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued October 30, 2000
Decided: April 11, 2001
 
 Appellant, on behalf of the National Labor Relations Board, petitioned for appropriate injunctive relief under § 10(j) of the National Labor Relations Act ordering appellee to bargain on an interim basis. The United States District Court for the Southern District of New York, Richard Conway Casey, Judge, found that the requested relief was not just and proper.
 Reversed and remanded.[Copyrighted Material Omitted]
 Laura T. Vazquez, Attorney, National Labor Relations Board, Washington, DC (Leonard R. Page, General Counsel; Mary Joyce Carlson, Deputy General Counsel; Barry J. Kearney, Associate General Counsel; Ellen A. Farrell, Deputy Assoc. General Counsel; Judith I. Katz, Ass't General Counsel), for Petitioner-Appellant.
 Thomas R. Gibbons, Hartford, CT (Cody Jaffe, Jackson Lewis Schnitzler & Krupman), for Respondent-Appellee.
 Before WALKER, Chief Judge, and OAKES and LEVAL, Circuit Judges.
 OAKES, Senior Circuit Judge:
 
 
 1
 The National Labor Relations Board ("Board") appeals from the denial of its application for an injunction under § 10(j) of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 160(j) (1998), ordering Inn Credible Caterers, Ltd. ("ICC") to bargain with the Hotel Employees and Restaurant Employees Union Local 100 ("Union"). Applying this Circuit's two-prong § 10(j) injunction test, the United States District Court for the Southern District of New York, Richard C. Casey, Judge, found that because the proposed injunction failed to satisfy the second prong, requiring that the injunctive relief be "just and proper," there was no need to inquire into the first prong, requiring that there be "reasonable cause" to believe that a violation of the Act was committed. We disagree with the district court's conclusion regarding the "just and proper" prong and find that the record amply supports reasonable cause. We therefore reverse and remand for entry of the requested injunction.
 
 BACKGROUND
 
 2
 This action involves a dispute between ICC and the Union over a series of incidents that occurred at the Bear Mountain Inn (the "Inn"). The Inn is a full-service hotel and restaurant with banquet facilities located in Bear Mountain State Park in Rockland County, New York. The Inn is owned by Palisades Interstate Park Commission, but it has been privately managed and operated for over twenty years by Aramark, Inc. ("Aramark").
 
 
 3
 Aramark's contract with the State expired on March 7, 1999. On March 8, 1999, ICC assumed responsibilities for the Inn on a short-term basis and on a regular basis about six weeks thereafter. The Union has represented the Inn's employees for 40 years. In 1977, it was certified as the exclusive collective bargaining representative by the Board.
 
 
 4
 From the time ICC began to assume responsibilities for the Inn, it refused to recognize or to bargain with the Union. On March 3, 1999, upon learning of ICC's probable takeover, the Union sent a letter to ICC requesting a meeting. Two days later, the Union sent a second letter. ICC did not respond to either letter. On March 8, ICC posted a notice soliciting employment applications directly from workers and stating that "[e]ffective March 8, 1999," ICC would be handling operations at the Inn. On March 12, ICC met with Union organizers but refused to bargain with them, declaring that "there is no union, there is no need to meet."
 
 
 5
 At some point during the first week of May, an Inn employee handed the president of ICC a letter purportedly signed by a majority of Inn employees expressing their desire not to be represented by the Union.[1] Nothing is known regarding the author of this letter or the circumstances surrounding its creation. The letter states:
 
 
 6
 We the employees of Bear Mountain Inn do not wish at this time to be represented by Local 100 or any other Local Union. We appreciate what you've done for us in the past and we know that you have worked hard for us as well. Thank you.
 
 
 7
 On May 10, 1999, the Union filed a charge with the Board alleging that ICC committed unfair labor practices. The Regional Director then issued a complaint against ICC for refusing to bargain with the Union under § 8(a)(5) of the Act. On November 24, 1999, the Regional Director petitioned the district court for an injunction ordering ICC to bargain in good faith with the Union under 29 U.S.C. § 160(j) of the Act. On April 17, 2000, the Administrative Law Judge ("ALJ") rendered his decision finding that ICC violated §§ 8(a)(1) and 8(a)(5) of the Act. ICC appealed the ALJ's decision to the Board, and that appeal is currently pending. On May 30, 2000, the district court denied the Regional Director's petition for § 10(j) injunctive relief. This appeal followed.
 
 DISCUSSION
 
 8
 We note at the outset that we are bound by the district court's findings of fact unless they are clearly erroneous and that we review fully all conclusions of law, including findings of reasonable cause. See Silverman v. J.R.L. Food Corp., 196 F.3d 334, 335-36 (2d Cir. 1999) (citing Kaynard v. Mego Corp., 633 F.2d 1026, 1030 (2d Cir.1980)). We review the district court's determination of whether relief is just and proper for abuse of discretion, see Mego Corp., 633 F.2d at 1030, bearing in mind -- to use Judge Craven's words -- that a "judge's discretion is not boundless and must be exercised within the applicable rules of law or equity." Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 193 (4th Cir. 1977), referred to and quoted in Henry J. Friendly, Indiscretion About Discretion, 31 EMORY L.J. 747, 777 (1982).
 
 
 9
 Prior to 1932, injunctions were commonly used by employers and granted by the courts to prevent union organization. In this context, they came to be perceived as a means of protecting the proprietary interests of the employers. After Congress passed the Norris-LaGuardia Act in 1932 and the NLRA in 1935, both of which limited court authority to intervene in labor disputes, the labor movement grew tremendously. In 1947, Congress passed the Taft-Hartley amendments to the NLRA. These amendments returned some authority to the federal courts to intervene in labor disputes by granting injunctions. Subsection 10(j) is among these amendments.
 
 
 10
 An employer has a duty under § 8(a)(5) of the Act to bargain collectively with the chosen representative of a majority of its employees. See 29 U.S.C. § 158(a)(5) (1998).[2] In certain circumstances, a successor employer is also under a legal duty to bargain with the union established under the predecessor employer. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 36-41 (1987). In such cases, a successor employer who refuses to bargain with the predecessor union violates the Act. See id. at 41. Pending the Board's determination of whether a successor employer is a legal successor with a statutory duty to bargain, the Board can petition a federal district court for an injunction under § 10(j) of the Act, ordering the successor employer to bargain with the union until the Board renders its final determination. See 29 U.S.C. § 160(j).
 
 
 11
 In this Circuit, in order to issue a § 10(j) injunction, the district court must apply a two-prong test. First, the court must find reasonable cause to believe that unfair labor practices have been committed. Second, the court must find that the requested relief is just and proper. See Hoffman v. Polycast Tech. Div. of Uniroyal Tech. Corp., 79 F.3d 331, 333 (2d Cir. 1996); Mego Corp., 633 F.2d at 1030.
 
 
 12
 In the current case, the district court did not conduct a reasonable cause analysis. It reasoned that because the Board failed to satisfy the just and proper prong, it was unnecessary to conduct a reasonable cause analysis. We disagree with the district court's analysis of the just and proper prong. We also find that there is reasonable cause in the record to believe that the Board would -- as in fact the ALJ did -- find that ICC violated the Act and that the district court committed reversible, clear error by not deferring sufficiently to the Regional Director in light of the record. Cf. Polycast, 79 F.3d at 334 (remanding grant of § 10(j) relief for finding of reasonable cause because record was too "weak" to support Regional Director's conclusion).
 
 I. Reasonable Cause
 
 13
 The district court does not need to make a final determination whether the conduct in question constitutes an unfair labor practice; reasonable cause to support such a conclusion is sufficient. See Silverman v. Major League Baseball Player Relations Comm., Inc., 67 F.3d 1054, 1059 (2d Cir. 1995). In this Circuit, when considering § 10(j) petitions, we give considerable deference to the NLRB Regional Director. As we have noted, "[w]ith respect to issues of fact, the Regional Director should be given the benefit of the doubt... and on questions of law, the Board's view should be sustained unless the court is convinced that it is wrong." Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1051 (2d Cir. 1980) (internal quotation omitted). See also Major League Baseball, 67 F.3d at 1059 (holding that the court should deny relief only if it believes that the Board's legal or factual theories are "fatally flawed"); Mego Corp., 633 F.2d at 1031 (holding that the court should draw all factual inferences in favor of the Board and sustain them if they are "within the range of rationality").
 
 
 14
 The question whether there is reasonable cause to support a finding that ICC committed an unfair labor practice turns on the question whether there is reasonable cause to believe that ICC was in a legal successorship relation with Aramark. Legal successors are under an obligation to recognize and to negotiate with the predecessor union. See Fall River Dyeing, 482 U.S. at 41. If ICC was a legal successor, then it was under a legal obligation to negotiate with the Union; having not done so, ICC would have committed an unfair labor practice. See id.
 
 
 15
 Many of the principles governing the legal successorship inquiry were announced by the Supreme Court in NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272 (1972) and in Fall River Dyeing, 482 U.S. 27. A finding of legal successorship is based upon a two-part inquiry. First, there must exist "substantial continuity" between the enterprises of the successor and the predecessor employers. See Fall River Dyeing, 482 U.S. at 43. Second, the successor must have hired a majority of the predecessor's employees at the time when the successor's workforce had reached a "substantial and representative complement." See id. at 47. If these two prongs are satisfied, then the successor employer is a legal successor under a duty to bargain with the preexisting union. See id.
 
 A. Substantial Continuity
 
 16
 The "substantial continuity" test is based upon a factual inquiry into the totality of circumstances. See Fall River Dyeing, 482 U.S. at 43. In determining whether there is "substantial continuity" between the enterprises such that the successor employer has a legal duty to bargain with the union of the predecessor employer's employees, the Board considers several factors: "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." Id. The "substantial continuity" inquiry is conducted from the employees', rather than from the employer's, perspective. See id. As the Fall River Dyeing Court noted, it is "[o]f particular significance... that, from the perspective of the employees, their jobs d[o] not change." 482 U.S. at 44.
 
 
 17
 Although the district court did not make any factual determinations relating to substantial continuity, the record shows reasonable cause to believe that there was substantial continuity between the respective enterprises of Aramark and ICC. Both employers engaged in the business of handling the catering and the recreational facilities at the Inn. The employees performed essentially the same jobs in essentially the same facilities with the same general public, and the majority of the job classification units remained the same. Moreover, the majority of Aramark's employees were hired by ICC to work in their previously assigned units. From their perspective, little changed when ICC assumed operations at the Inn. We therefore find that there is reasonable cause to support the Regional Director's finding that substantial continuity was achieved sometime between March 8, when ICC posted a notice announcing its takeover, and mid-April, when ICC obtained a liquor license and opened for regular business.
 
 
 18
 B. Substantial and Representative Complement
 
 
 19
 The second part of the two-part legal successorship inquiry relates to the composition of ICC's workforce. A successor employer who is in substantial continuity with the predecessor employer has a legal obligation to bargain with the predecessor union when it has hired a majority of the predecessor's employees. See Fall River Dyeing, 482 U.S. at 47.
 
 
 20
 The critical question in this inquiry relates to the appropriate time at which to make the determination of the presence of a majority in the successor's workforce. In Fall River Dyeing, the Court held that such a determination is to be made when the successor has hired a "substantial and representative complement" of its employees. See 482 U.S. at 46-52. See also Banknote Corp. of America, Inc. v. NLRB, 84 F.3d 637, 643 (2d Cir. 1996).
 
 
 21
 In determining the presence of a substantial and representative complement, the Board will consider several factors: "whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production... [and] the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work... as well as the relative certainty of the employer's expected expansion." Fall River Dyeing, 482 U.S. at 49 (internal quotations omitted).
 
 
 22
 The parties disagree over when ICC attained a substantial and representative complement of its workforce so as to calculate the presence of a union majority. Specifically, the disagreement is over the time at which ICC was running at normal or substantially normal operation. ICC contends that it was not running at normal operation until May 16, 1999, when only 29 out of its 79 employees were former Aramark employees. The Regional Director contends that normal operation was reached on April 18, when 29 of the 47 employees were former Aramark employees.
 
 
 23
 We find that the ALJ had reasonable cause to agree with the Regional Director.[3] The ALJ found that the May 16 employee roster reflected an increase from the normal roster in anticipation of the coming high-season. ICC argued on appeal that prior to May 16 the Inn was operating at lower, off-season levels, and that it didn't begin operating for "regular" business until around Memorial Day. What the ALJ perceived to be regular business followed by a high point in the season, ICC interprets as a low point in the season followed by regular business.
 
 
 24
 In the context of seasonal businesses, identifying one "representative" moment when the bargaining duty might attach can be an elusive enterprise. But this is an enterprise best left ultimately to the expertise of the Board. See NLRB v. DeBartelo, 241 F.3d 207, 212 n.9 (2d Cir. 2001). The district court needs only to have reasonable cause to believe that the Board would find that ICC had reached a substantial and representative complement by April 18, not that ICC did in fact reach one by that date. Although we recognize that the ALJ's finding might be overturned on ICC's appeal to the Board, we believe that it was supported by reasonable cause.
 
 II. Just and Proper
 
 25
 The just and proper standard for § 10(j) injunctions derives from the language of subsection 160(j) of the Act, which states in pertinent part:
 
 
 26
 The Board shall have power, upon issuance of a complaint... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court... for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.
 
 
 27
 29 U.S.C. § 160(j) (1998).
 
 
 28
 The Supreme Court has not yet passed criteria for granting § 10(j) injunctions. The congressional history surrounding § 10(j) is limited and fails to provide an unequivocal statement regarding when granting § 10(j) relief is "just and proper."[4] See Danielson v. Joint Bd. of Coat, Suit & Allied Gar. Wkrs. U., 494 F.2d 1230, 1242 (2d Cir. 1974). In response to this lack of guidance, courts have taken different views on when it is just and proper to grant injunctive relief under § 10(j).[5]
 
 
 29
 In this Circuit, injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo. See Mego Corp., 633 F.2d at 1033; Major League Baseball, 67 F.3d at 1062; McLeod v. General Elec. Co., 366 F.2d 847, 850 (2d Cir. 1966), vacated as moot, 385 U.S. 533 (1967). While this standard preserves traditional equitable principles governing injunctive relief, we are mindful to apply them in the context of federal labor laws. See Seeler v. Trading Port, Inc., 517 F.2d 33, 40 (2d Cir. 1975) ("section 10(j) should be applied... so as to further the policies of the Act") (internal quotation omitted).
 
 
 30
 The district court in this case interpreted the just and proper standard to require that the Board must "demonstrate irreparable harm to the employees[,]" and that "in the absence of any evidence that serious and pervasive harm has been visited upon [ICC's] employees, an injunction cannot be deemed just and proper." Hoffman v. Inn Credible Caterers, Ltd., No. 99 Civ. 11584(RCC), 2000 WL 707155 at *2, *3 (S.D.N.Y. May 31, 2000). We believe that this formulation misstates our Court's approach to applying the just and proper prong.
 
 
 31
 One of the underlying purposes of § 10(j) is to preserve the status quo in order to protect employees' statutory collective bargaining rights. As we noted in Trading Port, "the district court has the power to order immediate bargaining to prevent irreparable harm to the union's position in the plant, to the adjudicatory machinery of the NLRB, and to the policy of the Act in favor of the free selection of collective bargaining representatives." 517 F.2d at 39. Under this reasoning, we find that the district court's analysis of the "totality of the circumstances" regarding the manner in which ICC was treating its employees to be inapposite.[6] See Inn Credible Caterers, 2000 WL 707155 at *2 n.3. The district court misidentifies the proper plaintiff in § 10(j) cases as the individual employees rather than the Regional Director, and it mistakenly places a burden on the § 10(j) petitioner to provide evidence of "adverse treatment" to individual employees.
 
 
 32
 We hold that the appropriate test for whether harm is irreparable in the context of § 10(j) successorship cases is whether the employees' collective bargaining rights may be undermined by the successor's unfair labor practices and whether any further delay may impair or undermine such bargaining in the future.
 
 
 33
 In the context of successor employers who can damage employee confidence in preexisting unions by simply failing to recognize them until after they have hired an alternative non-union workforce, there is a pressing need to preserve the status quo while the Board's final decision is pending.[7] Without such preservation, the Board's determination of any violations will be meaningless in the context of a new majority workforce committed to non-unionization.
 
 
 34
 In this case, we find that failure to preserve the status quo would bring irreparable harm to the employees' ability to exercise their collective bargaining rights. By its own violation of the Act, ICC was able to hire a non-union workforce and thereby threaten to weaken severely, if not destroy, the power of the predecessor's employees to assert their collective bargaining rights. Rather than protecting the status quo, the failure of the district court to issue an injunction maintained what the Regional Director had reasonable cause to believe was a violation of the Act and threatened to render the Board's processes totally ineffective by undermining the force of its remedial power.
 
 
 35
 In this Circuit, the appropriate status quo in need of preservation is that which was in existence before the unfair labor practice occurred. As we said in Trading Port, "the status quo which deserves protection under § 10(j) is not the illegal status quo which has come into being as a result of the unfair labor practices being litigated.... Instead, section 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices." 517 F.2d at 38. See also Fall River Dyeing, 482 at 51 n.18 (loss oF.Supp.ort is no defense when "such loss oF.Supp.ort is a foreseeable consequence of the employer's unfair labor practice") (citation omitted).
 
 
 36
 ICC points to the contested May letter in which a majority of Inn employees purportedly expressed a collective desire not to be represented by the Union. The import of this letter turns on the question of when ICC's bargaining duty, if any, attached. Specifically, the question is whether the district court had reasonable cause to believe that ICC had a duty to bargain with the Union before the letter was received. If it did, then lack of employee support afterwards is no defense to a violation of that duty.
 
 
 37
 As we noted above in Section I, the district court must give considerable deference to the Board or Regional Director when making a determination of reasonable cause. We find here that the district court failed to observe this rule of deference and hold that there was reasonable cause to believe that ICC's bargaining duty attached before the May letter was received by ICC's president. Accordingly, there was reasonable cause to believe that ICC committed an unfair labor practice before the May letter. Under this reasoning, the appropriate status quo to be preserved was in existence prior to ICC's receipt of the May letter. In these circumstances, the letter is irrelevant to the inquiry whether § 10(j) relief is just and proper. Moreover, we note that it is hardly surprising that a new majority of employees would oppose unionization when a successor employer refuses to bargain with the predecessor union while at the same time hiring additional, non-union employees.
 
 
 38
 Our reasoning leads us to conclude that both prongs of the § 10(j) injunction test are satisfied in this case. Because we find that the district court had reasonable cause to believe that ICC had violated the Act by failing to bargain with the Union as a legal successor and that injunctive relief under § 10(j) of the Act was just and proper, we hereby reverse and remand to the district court with instructions to enter an order for the requested injunctive relief.
 
 CONCLUSION
 
 39
 For the reasons set forth above, we reverse the judgment of the district court and remand for entry of the requested injunction.
 
 
 
 NOTES:
 
 
 [1]
 The letter was signed by approximately 51 employees. Of those signatures, only 37 were ever verified. The Administrative Law Judge found that on May 9 the Inn employed 81 employees. No employees testified regarding the origins of or the signatories to this letter.
 
 
 [2]
 29 U.S.C. § 158(a) holds in pertinent part: "It shall be an unfair labor practice for an employer -- (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [subsection 9(a)]." Subsection 9(a) identifies the representative designated by a majority of the employees in a unit as the exclusive bargaining representative of those employees. See 29 U.S.C. § 159(a) (1998).
 
 
 [3]
 The ALJ found that by April 18, with the exception of one department, the majority of ICC's job classifications were established, and the majority of ICC's workforce in each department consisted of former employees. The ALJ also found that the two new job classifications that ICC introduced after April 18 (the host/ess and the busser) failed to render the previous complement "unrepresentative."
 
 
 [4]
 Following are some concerns expressed in the Senate report:
 [T]he committee is convinced that additional procedures must be made available under the National Labor Relations Act in order adequately to protect the public welfare.... Time is usually of the essence in [§ 10(j) cases], and consequently the relatively slow [Board process] falls short of achieving the desired objectives.... Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices.... Experience... has demonstrated that... the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done.... Since the Board's orders are not self enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation.
 S.Rep.No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted in 1 Legislative History of the Labor Management Relations Act, 1947 414 & 433 (1948).
 
 
 [5]
 See, e.g., Calatrello v. "Automatic" Sprinkler Corp. of America, 55 F.3d 208, 214 (6th Cir. 1995) ("[t]he primary concern" in a just and proper inquiry is restoring the status quo "in order to protect the Board's remedial powers"); Miller v. California Pacific Med. Ctr, 19 F.3d 449, 461 (9th Cir. 1994) (en banc) (applying "just and proper" prong "in accordance with traditional equitable criteria considered in the context of the federal labor laws and the underlying purposes of § 10(j), to protect the integrity of the collective bargaining process and to preserve the Board's remedial powers"); Arlook v. S. Lichtenberg & Co., Inc., 952 F.2d 367, 372 (11th Cir. 1992) (relief is just and proper "whenever... 'any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the [NLRA] will be frustrated'"); Kinney v. Pioneer Press, 881 F.2d 485, 491 (7th Cir. 1989) (interpreting just and proper "as a statement that traditional rules govern -- the approach emphasizing the public interest applied when the government is the plaintiff"); Maram v. Universidad Interamericana de Puerto Rico, Inc., 722 F.2d 953, 958 (1st Cir. 1983) (in § 10(j) cases, "the whole panoply of discretionary issues [irreparable injury, weighing of harms, likelihood of success, and public interest] with respect to granting preliminary relief must be addressed"); Angle v. Sacks, 382 F.2d 655, 661 (10th Cir. 1967) (injunctive relief is just and proper when "the purposes of the Act could be defeated").
 
 
 [6]
 The district court wrongly dismissed the importance of the employees' collective bargaining rights when it found that the employees "suffered no material adverse consequences related to [ICC's unfair labor practice], other than the loss of union leaders and a grievance procedure". Inn Credible Caterers, 2000 WL 707155 at *2.
 
 
 [7]
 We have rejected ICC's argument that an injunction to bargain in good faith and also on an interim basis puts them in an impossible situation. See Trading Port, 517 F.2d at 40 (there is "nothing permanent about any bargaining order... particularly an interim order which will last only until the final Board decision") (citing NLRB v. Gissel Packing Co., 395 U.S. 575, 613 (1969)). See also Palby Lingerie, 625 F.2d at 1054-55 ("[W]e do not believe the absence of a final unit determination should necessarily preclude an interim bargaining order.").