*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0428P (6th Cir.)
File Name: 03a0428p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHARD L. AHEARN,
Regional Director of the
Ninth Region of the National
Labor Relations Board, for
and on behalf of the
NATIONAL LABOR RELATIONS
BOARD,

      *Petitioner-Appellee,*

    *v.*

JACKSON HOSPITAL
CORPORATION, d/b/a
Kentucky River Medical
Center, Inc.,

      *Respondent-Appellant.*

No. 02-5371

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 02-00009—Joseph M. Hood, District Judge.

Argued: September 17, 2003

Decided and Filed: December 5, 2003

Before: BOGGS, Chief Judge; KRUPANSKY and CLAY,
Circuit Judges.

_____

## COUNSEL

**ARGUED:** Robert D. Hudson, GREENEBAUM, DOLL &
McDONALD, Covington, Kentucky, for Appellant. Aaron
N. Karsh, NATIONAL LABOR RELATIONS BOARD,
APPELLATE COURT BRANCH, Washington, D.C., for
Appellee. **ON BRIEF:** Robert D. Hudson, Luann Devine,
GREENEBAUM, DOLL & McDONALD, Covington,
Kentucky, for Appellant. Aaron N. Karsh, Judith I. Katz,
Seema Nanda, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. Respondent Jackson Hospital
Corporation, d/b/a Kentucky River Medical Center, Inc. (the
"Hospital"), appeals from the judgment of the district court,
entered on January 22, 2002, which granted to Petitioner
Richard L. Ahearn ("Petitioner"), Regional Director of the
Ninth Region of the National Labor Relations Board (the
"Board") and on behalf of the Board, a temporary injunction,
pursuant to § 10(j) of the National Labor Relations Act
("NLRA"), 29 U.S.C. § 160(j). The petition for injunction
arose from the Board's administrative investigation into
unfair labor practices allegedly committed by the Hospital
against its employees, in violation of § 8(a)(1), (3), and (5) of
the NLRA, 29 U.S.C. § 158(a). On appeal, the Hospital
principally argues that (1) the district court used an incorrect
legal standard in granting the injunction, and (2) the district
court's decision amounted to clear error and an abuse of
discretion.

For the reasons that follow, we **AFFIRM** the district
court's injunction order.

### Procedural History

On January 26, 2001, the Board filed a Petition for Injunction under § 10(j) of the NLRA, 29 U.S.C. § 160(j). The petition alleged, in pertinent part, that there was reasonable cause to believe that the Hospital had undertaken various actions that violated § 8(a)(1), (3), and (5) of the NLRA, 29 U.S.C. § 158(a). On February 16, 2001, the Board filed an Amended Petition to the same effect, which included additional claims for relief, specifically: (1) unlawful threats of discharge, loss of jobs, and license revocation for engaging in strike activity; (2) unlawful surveillance of employees participating in a union strike; (3) unlawful discharge and disciplining of employees in retaliation for their union activities; (4) post-strike implementation of break schedules for unit employees without providing notice and opportunity for collective bargaining on the issue; and (5) refusal to meet and collectively bargain with the employees' recently-established union. The Board requested injunctive relief, specifically that the district court order the Hospital (pending the NLRB's ruling on the merits with respect to a simultaneous administrative proceeding before it) to reinstate the discharged employees, to recognize and bargain with the union, and to cease and desist from committing the unfair labor practices. The Hospital filed an answer, in which it denied that it had engaged in unfair labor practices and denied that the Board was entitled to a temporary injunction.

On January 18, 2002, the district court entered a 60 page memorandum opinion and order granting the petition in part. In relevant part, it ordered the reinstatement of three discharged Hospital employees, and it ordered the Hospital to cease and desist from unlawfully threatening employees with discharge, conducting surveillance of its employees while they are lawfully striking, and altering employees' break schedules without providing notice and opportunity to engage in collective bargaining. Judgment to this effect was entered on January 22, 2002.

On February 20, 2002, the Hospital moved for a partial stay pending appeal to this Court, which the district court denied on March 22, 2002. The Hospital filed a notice of appeal on March 19, 2002. The Board filed a cross-appeal with respect to the portions of the district court's order that denied injunctive relief, but later withdrew the cross-appeal by stipulation of dismissal on June 24, 2002.

### Facts

**A. The Union's Formation and the Hospital's Refusal to Negotiate**

The Hospital operates a 55 bed acute care hospital in Jackson, Kentucky. On June 8, 1998, the Union Steelworkers of America, AFL-CIO-CLC (the "Union") was certified as the exclusive bargaining representative for the Hospital's 170 nurses and non-professional employees. The Union met with the Hospital several times to negotiate a first contract, but was unsuccessful. A decertification election was held on December 10, 1999, but the Union filed unfair labor practice charges, and the Board impounded the ballots pending an investigation. Following the resolution of these charges, the ballots were counted and the Union won the election. The Union demanded bargaining in April of 2000, but the Hospital refused to meet with the Union, claiming that the Union had to provide a complete economic proposal before it would bargain.

**B. The Hospital's Threats, Union Strike, and the Hospital's Hostility Toward the Strikers**

By the spring of 2000, the employees began to murmur about a possible strike to pressure the Hospital into bargaining with the Union. Evidence was presented that in April 2000, the Hospital's supervisors told the employees that strikers might lose their jobs. Supervisor Ken Hicks told an employee in April 2000 that, in the event of a strike, employees who were replaced "would not have a job" when

the strike ended. House supervisor Phyllis Gibbs told a group of employees in June that any employees who did not have a contract and went on strike would be fired. Also in June 2000, nursing supervisor Allena Hale told three employees that she had been told that employees would be fired if they went on strike without a contract. Dr. Edward Burnette, the emergency room director, told at least four employees that if they went on strike they were "setting [themselves] up to be fired." (J.A. at 763-66). On several other occasions, Dr. Burnette told employees that if they insisted on participating in union activity and going on strike they would lose their jobs.

In mid-June 2000, the Union served the Hospital with a 10 day strike notice. Soon thereafter, supervisor Diana Blankenship told a group of five employees that "if this is not ruled an unfair labor practice strike, some of you all will not be coming back," and made a similar comment to another employee on another occasion. On July 7, 2000, employee Anita Turner approached her supervisors, asking to alter her schedule so she could participate in the strike. Chief nursing officer Michelle Boyce-Obenchain became "very angry" and "loud" and told Turner that if she left the facility Obenchain would see to it that Turner lost her license, based on patient abandonment. Obenchain had initiated such procedures in the past.

Nevertheless, the Union went on strike on July 8, 2000. During the strike, the Hospital had picketers videotaped as they engaged in their strike activities. The Hospital also posted anti-union signs from a hospital window visible from where the employees picketed. On August 15, 2000, the Union made an unconditional offer to return to work, which the Hospital accepted. The strikers returned to work on August 20, 2000.

## C. The Hospital's Post-Strike Adverse Actions

### 1. Terminations of Laotta Sizemore, Clara Gabbard, and Sandra Barker Hutton.

This appeal principally revolves around the terminations of three employees: Laotta Sizemore, Clara Gabbard, and Sandra Barker Hutton.

Laotta Sizemore was a registered nurse (RN) hired by the Hospital in 1992 as a weekend house supervisor. Sometime after the union was originally certified in 1998, Sizemore's position was eliminated and she became a nonsupervisory night shift RN. Thereafter she became active in the Union, wearing union buttons to work and speaking out in favor of the Union. During the strike, Sizemore accepted a full-time position as an emergency room nurse manager at another hospital, but she wished to continue working at the Hospital on a part-time, or "PRN," basis. On August 15, 2000, the day the strike ended, Sizemore notified the Hospital of this desired change by letter, stating, "Effective today, I would like to change my status from full-time to PRN." The Hospital sent Sizemore a return-to-work letter, dated August 17, 2000, instructing her to report to work at 5 p.m. on August 22, 2000. (J.A. at 735, 962.) Sizemore indeed reported on August 22, 2000 only to discover that although her name appeared on the schedule, her shifts were crossed out. Sizemore queried Hale as to why her shifts were crossed out, and Hale replied that she did not know. Sizemore left messages for Obenchain and her supervisor, neither of whom returned her calls.

On September 4, 2000, Sizemore agreed to cover someone else's shift and completed the necessary paperwork. When she called supervisor Jeri Howard to ensure that she was on the schedule, Howard replied that Sizemore was "not on the schedule any more." (J.A. at 740.) As it turned out, after Sizemore submitted her change-of-status request, Obenchain recommended to the Hospital's CEO David Bevins that

Sizemore not be retained as a PRN because she had failed to work a 15 day notice period before resigning, pursuant to the Hospital's resignation policy. Thus, Sizemore was discharged. Her discharge papers indicate an effective date of August 21, 2000 and state that Sizemore resigned, failed to work her notice period, and was non-rehirable. Obenchain nevertheless failed to contact Sizemore with any of this information, nor did she even return the calls Sizemore had placed to her upon discovering her crossed-out schedules on August 22, 2000. Obenchain also acknowledged that no Hospital policy states that an employee has to resign or work a notice period before converting from full-time to PRN status, which is what Sizemore's August 15, 2000 written notice had clearly endeavored to do.

Clara Gabbard had been a part-time ward clerk with the Hospital since 1990. In April of 2000, Gabbard gave her supervisor, Robin McGlothen, written notice that she was unavailable to work the weekends of August 27 and September 2, 2000, due to her annual participation as chairperson of the Breathitt County Honey Festival. Subsequently, Gabbard became involved in union activity, informing Obenchain that in the event of a strike she would not cross the picket line and supposedly received a "mean" and "hateful" look in response. (J.A. at 698-701.) Indeed, Gabbard actively participated in the strike, including making pro-strike tapes that were placed on a local radio station and published in the newspaper.

After the strike, Gabbard again reminded the Hospital on August 17 and 20, 2000, that she needed the following two weekends off to serve at the Honey Festival. The Hospital nevertheless put her on the schedule, and Gabbard learned of this from another employee on August 26, 2000. Gabbard again gave notice, this time to supervisor Hale. Gabbard indeed did not work the weekend of August 27, 2000, and the Hospital found another employee to cover the shift. However, on August 31, 2000, the Hospital notified Gabbard by letter of her termination. Obenchain testified that she

recommended Gabbard's discharge for failing to follow the Hospital's "trade and cover" policy. (J.A. at 857-59.) The policy requires employees to obtain their own coverage if they do not notify supervisor Obenchain of such intended absences by 7:00 a.m. of the 15th of the month. Because Obenchain received Gabbard's request for time off on August 20, 2000, the Hospital apparently reasoned, Gabbard was responsible for finding her own coverage. The Hospital had mailed a copy of the policy with correspondence, via certified mail, directing Gabbard to follow the "trade and cover" policy. However, Gabbard evidently did not receive the certified mail. However, the "trade and cover" policy does not mention discipline or discharge for failure to follow the policy. (J.A. at 882-84.)

The Hospital has a separate "incidents of absence" policy, which provides that for each unexcused absence where an employee provides at least two hours notice, the employee receives an "incident of absence." (J.A. at 1007). Two "incidents of absence" within a 90 day period results in a verbal warning. It is undisputed that Gabbard provided well over two hours notice of her intended absence. (Indeed, Gabbard provided several months' notice considering her first notification to her supervisor in April of 2000, although admittedly not to Obenchain directly.) It also appears undisputed that Gabbard did not have any "incidents of absence" on her record at the time of her August 27, 2000 absence. Nevertheless, Obenchain did not consider an alternative penalty to discharge in Gabbard's case. Moreover, prior to the strike, another employee, Jeri Howard, had agreed to cover another employee under the "trade and cover" policy, but failed to show up, and received only a verbal warning. (J.A. at 864-68.) No explanation was provided by the Hospital for this apparent differential treatment.

Sandra Barker Hutton was a billing and admitting clerk for the Hospital between March 1996 and March 1998, and a PRN thereafter. Hutton also worked full-time during the day for the commonwealth attorney's office. Hutton also was

active with the Union, wearing buttons from 1998 through July of 2000, and she picketed during the strike. Following the strike, the Hospital informed Hutton by letter of her return to work as a PRN.

In March of 2000, the Hospital's owner, Community Health Systems ("CHS") reached a $31 million settlement agreement with the United States government regarding its various violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* As part of this agreement, CHS's hospitals were required to conduct claim fraud prevention training in the form of a one-hour video by September 9, 2000. Based on the September 9, 2000 deadline, the Hospital set an internal deadline of September 1, 2000 for the completion of training. The Hospital's CFO Randy Cooper posted a schedule of viewings to take place on August 14 to 27, 2000.

Hutton received a phone call from representatives from the Hospital's business office, who scheduled Hutton to watch the compliance video on August 30, 2000 at 3:00 p.m. Hutton was never informed by anyone of the September 1 deadline or that anyone missing the deadline would be terminated. Hutton took time off from her full-time job to attend the scheduled August 30, 2000 viewing, but was told that the training had been canceled due to a computer foul-up. She was also told by her supervisor Denise Trusty that she would be called to reschedule the training and that she had to complete the training before returning to work. Again, Hutton was not informed of any deadline to complete the training.

A week later, after her supervisor still had not called her, Hutton called Trusty to ask about the training. Trusty told her that she did not have a date yet but told Hutton to call back the following Monday. Hutton called on the following Monday, September 11, 2000, and left a message but received no return phone call. The following day, she received a letter from CFO Randy Cooper informing her that she was being purged from the Hospital's PRN listing because she had

"made no effort to attend any video session" and because the deadline for viewing had been August 27, 2000 (not September 1, 2000, as Cooper later testified). (J.A. at 803, 964).

### 2.    Other Adverse Actions

Prior to the strike, the Hospital's housekeeping and maintenance employees had been allowed to select their own break and lunch times. However, immediately following the strike, the Hospital implemented a schedule for breaks and lunches, which assigned a particular break and lunch time for each employee. The record also contains an assortment of evidence pertaining to various other firings of employees who had participated in the strike, namely Lois Noble, Beverly Clemons, Sandra Baker, and Diane Taulbee. Additionally, the Hospital issued a verbal warning to phlebotomist Sally Dunn, who was a strong union supporter prior to the strike. On her second day back to work following the strike, Dunn testified that she was approached by her supervisor, Diana Blankenship, and accused of taking a 30 minute break, when in fact she had taken a 15 minute break. Dunn told Blankenship that she could verify it on the computer, but Blankenship allegedly replied, "It doesn't matter, they said you did, so consider this a verbal warning." Blankenship then asked Dunn if she had taken a phlebotomy tray outside while smoking, and Dunn admitted that she had. Blankenship repeated that Dunn could consider this a verbal warning.

### 3.    The Chilling Effect on Employees

Evidence in the form of several affidavits was presented indicating that these actions by the Hospital had created a chilling effect on the employees' Union support. Registered nurse Patricia Hollifield averred in an affidavit that she knew of several strikers, including Gabbard, who were fired after the strike and that she was very careful thereafter to avoid openly supporting the Union; she also indicated that other employees wanted to "lay low" about Union support for fear

of retaliatory discharge. Registered nurse Anita Turner, who had been threatened by Obenchain with license revocation, averred that she felt like a "nervous wreck" based on her knowledge of several firings and Obenchain's threats, and she consequently accepted a job at another hospital. Registered nurse Shirley White had also experienced a chilling effect after learning of several firings (including Gabbard's), causing her to believe that "the [H]ospital wants to fire all the strikers." She averred that she had spoken to other employees who felt the same way. Although she had worn a button and attended union meetings prior to the strike, she never wore a union button again after the strike, for fear of retaliation. She also indicated that she never saw other employees wearing union buttons after the strike. Additionally, Janie Jenkins testified that, although she had worn a union button regularly for six months preceding the strike, she only wore a union button for a week following the strike and stopped thereafter, as did virtually all of her colleagues. She added that because of the discharges, the threats, the resignations, and the Hospitals' refusal to bargain, she "felt really discouraged and felt like the union couldn't really help us." (J.A. at 113.) She also averred that she was afraid of being fired for any small error, and that she had talked with several other employees who felt the same way.

## D.   The District Court's Decision

In a January 18, 2002 order, the district court found that the Board had established reasonable cause to believe that the Hospital had committed § 8(a)(1) violations with respect to the firing of six employees (including the three firings at issue in this appeal), as well as the Hospital's repeated threats of job loss or license revocation, intimidating anti-union signs during the strike, unlawful video surveillance of the strikers, and alteration of employees' break schedules after the strike.

Regarding Sizemore's discharge, the district court found that Sizemore's August 15, 2000 letter requesting a change in status was not a resignation, that no policy required a nurse to

resign before changing status, and that no one notified Sizemore of any possible adverse consequences related to her request. Regarding Gabbard's discharge, the court found that evidence existed in the record indicating that the Hospital's asserted reason for the termination was pretextual inasmuch as a similarly-situated employee had received less harsh treatment and the Hospital's policies did not contemplate discharge for first-time unexcused absences. Regarding Hutton's discharge, the court found reasonable cause for a § 8(a)(1) violation inasmuch as Hutton's discharge closely followed her strike participation and because she was not notified of any adverse consequences for failure to complete training by a certain date.

The district court also found that granting a temporary injunction for interim reinstatement of the terminated employees was "just and proper" because the threats of getting fired, closely followed by actual firings, was "inherently chilling to union support," and because the four affidavits suggested that the Hospital's adverse actions were "actually having a chilling effect on union support." (J.A. at 90.) The district court therefore ordered the Hospital to reinstate Sizemore, Gabbard, and Hutton, as well as the other adversely-affected employees. The court also ordered the Hospital to cease and desist from unlawfully threatening its employees with termination, engaging in surveillance of striking employees, and altering the employees' break schedule without notice and opportunity for union bargaining.

## E.   The Administrative Law Judge's Administrative
##       Decision

On February 20, 2002, the administrative law judge (ALJ) presiding over the administrative proceedings with respect to the Hospital's actions, also found that the Hospital had unlawfully terminated Sizemore, Gabbard, and Hutton. The ALJ rejected the Hospital's argument that Sizemore failed to follow the resignation and reinstatement policy, finding instead that Sizemore did not resign but only requested a

change of status. The ALJ was particularly persuaded by the fact that Obenchain initially granted Sizemore's request and placed her on the schedule but later crossed her off. The ALJ also found that Gabbard's actions were not subject to termination under the Hospital's policies inasmuch as she gave more than two hours' notice of her intended personal absence and that similarly situated employees had received better treatment. Finally, the ALJ found that Hutton's termination was discriminatory, based on four factors: (1) the Hospital's inconsistent testimony about the deadline for watching the compliance video, (2) the Hospital's failure to inform Hutton that she would be terminated if she did not watch the video, (3) the Hospital's false accusation that Hutton made no attempt to watch the video, when in fact she had shown up as scheduled and made several follow-up phone calls to no avail, (4) the Hospital's false accusation that Hutton was difficult to reach, and (5) "significant evidence of disparate treatment." Indeed, the ALJ refused to credit any of the Hospital's representatives' testimony on the matter inasmuch as it was "replete with falsehoods and with obvious and unexplained inconsistencies." (J.A. at 63.) The ALJ also found that the Hospital's threats, video surveillance, and intimidating signs activity constituted § 8(a)(1) violations, and that the unilateral break schedule changes violated § 8(a)(5) of the NLRA.

Unlike the district court, however, the ALJ did not find the discipline of Sally Dunn, who had been smoking a cigarette while handling blood samples, violated § 8(a)(3). In light of this ruling, Petitioner no longer argues in favor of the district court's ruling on this point.

## I.

The issue of whether a district court applied the correct legal standard is a legal question, which this Court reviews *de novo. United States v. Willis,* 257 F.3d 636, 642 (6th Cir. 2001) (citing *In re Sorah,* 163 F.3d 397, 400 (6th Cir. 1998)) (internal citation omitted).

The Hospital devotes a large segment of its brief to challenging the district court's use of the "reasonable cause/just and proper" standard, which this Court has employed with respect to § 10(j) injunctions. Specifically, the "reasonable cause/just and proper" standard requires that a district court find that (1) there is "reasonable cause" to believe that unfair labor practices have occurred, and that (2) injunctive relief with respect to such practices would be "just and proper." *Schaub v. West Mich. Plumbing & Heating, Inc.,* 250 F.3d 962, 969 (6th Cir. 2001). The Hospital argues that the more "traditional" framework for reviewing petitions for injunctions is correct in this context and urges this Court to reverse on this basis. The traditional framework is the four-factor test employed by this Court in the context of other petitions for injunctions, and requires a district court to consider (1) whether the moving party has a substantial or strong likelihood of success on the merits; (2) whether the moving party would otherwise suffer irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether a preliminary injunction would serve the public interest. *See Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000). We disagree with the Hospital.

### A. The "Reasonable Cause/Just and Proper" Inquiry is Supported by Longstanding Sixth Circuit Precedent that a Panel Cannot Overrule

We note initially that this circuit has consistently used the "reasonable cause/just and proper" standard. A contrary holding of this panel would contravene the rule that one panel cannot overrule another panel; thus the "reasonable cause/just and proper" standard may only be overruled by this Court sitting *en banc* or the Supreme Court. *See United States v. Moody,* 206 F.3d 609, 615 (6th Cir. 2000) (citing *Salmi v. Secretary of Health & Human Servs.,* 774 F.2d 685, 689 (6th Cir. 1985)).

Although the Hospital claims that the U.S. Supreme Court has ruled to the contrary on this issue, it only cites *Weinberger v. Romero-Barcelo,* 456 U.S. 305 (1982) for this proposition. The Hospital fails to explain the many Sixth Circuit cases that have been decided using the "just and proper" standard in the twenty years since *Weinberger. See, e.g., Fleischut v. Nixon Detroit Diesel, Inc.,* 859 F.2d 26 (6th Cir. 1988); *Gottfried v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 80*, 927 F.2d 926 (6th Cir. 1991); *Kobel v. United Paperworkers Int'l.,* 965 F.2d 1403, 1409 n.3 (6th Cir. 1992); *Schaub*, 250 F.3d at 669. If the current 10(j) standard were in clear contravention of Supreme Court precedent, it seems unlikely that this or any other circuit would have continued to adhere to it for two decades without concern.

The Hospital also asserts that our decision in *EEOC v. Anchor Hocking Corp.,* 666 F.2d 1037 (6th Cir. 1981) compels us to use the "traditional" standard. *Anchor Hocking* held that Title VII's provision authorizing the Equal Employment Opportunity Commission ("EEOC") to request temporary injunctive relief does not permit a district court to issue a preliminary injunction without the traditional showing of irreparable injury. *Id.* at 1040-41. *Anchor Hocking* thus rejected the EEOC's suggested standard that, upon the filing of a discrimination charge–a prima facie showing of a Title VII violation–and a district court's determination that "prompt judicial action is necessary," a preliminary injunction must issue. *Id.* at 1040-41. However, *Anchor Hocking* dealt with a different statute, specifically, § 706(f)(2) of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e-5(f)(2), and the Court undertook a careful statutory analysis before rejecting the EEOC's argument that a showing of irreparable injury is not necessary. And, contrary to the Hospital's contentions, Title VII does not have the same language as the NLRA: in particular Title VII does not

contain the "just and proper" language.[1] The Hospital may realize that these cases are not on point, given that it asks the Court to "*revisit* the current 10(j) standard" and "*abandon*[]" it "in favor of a traditional balancing test." (Hospital Br. at 17) (emphasis added).

## B. The "Reasonable Cause/Just and Proper Standard" Properly Takes into Account a Hospital's Interests

The Hospital also suggests that the "reasonable cause/just and proper" standard does not properly take into account the special interests of a hospital in maintaining a safe environment and optimal patient care, and that this Court could alternatively carve out a special exception for hospitals. We disagree.

The case law reflects that the "reasonable cause/just and proper" standard adequately protects the special interests of hospital employers in maintaining optimal patient care. For instance, in *Frye v. District 1199,* 996 F.2d 141 (6th Cir. 1993) (*per curiam*), the district court granted an injunction limiting the amount of picketing in which workers could engage around a nursing home. The union appealed, and the Sixth Circuit affirmed, holding that the injunction was appropriate. Among other things, it observed that "when Congress amended the NLRA in 1974 to cover health care institutions, 'there was a recognized concern for the need to

---

[1]Title VII provides, in relevant part, that "[w]henever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission . . . may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge." 42 U.S.C. § 2000e-5(f)(2). Section 10(j) of the NLRA, on the other hand, indicates that "[t]he Board shall have power . . . to petition any United States district court . . . for appropriate temporary relief or restraining order. . . . [T]he court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems *just and proper*." 29 U.S.C. § 160(j) (emphasis added).

avoid disruption of patient care whenever possible.' . . . Accordingly, a court may consider the special characteristics of health care institutions when determining an appropriate remedy." *Id.* at 145 (citations omitted).

The most likely reason that the district court did not discuss this "patient care" theory at length is because this case does not raise health or safety concerns. It is not as if employees Sizemore, Gabbard, and Hutton were fired for engaging in dangerous behavior that could negatively impact the welfare of the Hospital's patients. The Hospital makes much of the district court's decision with respect to Sally Dunn, who had been disciplined for smoking while carrying a tray of blood samples, but this has essentially become a non-issue inasmuch as the ALJ ruled in favor of the Hospital with respect to the discipline of this employee and the Board has decided not to pursue her claim on appeal. Because we believe that sufficient flexibility exists in the application of the "reasonable cause/just and proper standard" to differentiate hospitals from other types of employers to the extent necessary to protect a hospital's special circumstances, we reject the hospital's rationale.[2]

We pause to observe that a number of circuits have overhauled the "reasonable cause/just and proper" standard, instead adopting the "traditional" test. *See, e.g., Pye v. Sullivan Bros. Printers, Inc.,* 38 F.3d 58, 64 n.7 (1st Cir. 1994); *Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 456-59 (9th Cir. 1994) (*en banc*); *Kinney v. Pioneer Press,* 881 F.2d 485, 489-91 (7th Cir. 1989); *see also Sharp v. Parents in Cmty. Action, Inc.,* 172 F.3d 1034, 1038 (8th Cir. 1999) (retaining the "reasonable cause/just and proper"

---

[2]At oral argument, counsel for the Hospital argued that the current "reasonable cause/just and proper" standard "handcuffs" district courts in deciding whether to grant an injunction because a district court is not permitted to consider outside testimony under the standard. Contrary to the Hospital's argument, we think the current standard has shown its flexibility in a variety of factual circumstances.

standard but also incorporating the traditional elements, such as irreparable injury, into the "just and proper" prong of the analysis). However, other circuits have retained the standard. *See, e.g., Sharp v. WEBCO Indus., Inc.,* 265 F.3d 1085, 1089-90 (10th Cir. 2001); *Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd.,* 247 F.3d 360, 364-65 (2d Cir. 2001). Therefore, we are not alone in retaining the "reasonable cause/just and proper standard."

## II.

We next decide whether the district court committed error when it granted an injunction for the Petitioners in this case. As we just stated, the "reasonable cause/just and proper" test requires a district court to find that there is "reasonable cause" to believe that the employer engaged in unfair labor practices, and that the relief requested is "just and proper." We review the "reasonable cause" finding for clear error. *Gottfried v. Frankel,* 818 F.2d 485, 493 (6th Cir. 1987) (citing *Kobell v. Suburban Lines, Inc.,* 731 F.2d 1076, 1084 (3d Cir. 1984)). This Court reviews the "just and proper" determination for an abuse of discretion. *Schaub,* 250 F.3d at 970 (citing *Kobell v. United Paperworkers Int'l Union, AFL-CIO, CLC,* 965 F.2d 1401, 1409-10 (6th Cir. 1992)).

### A.   "Reasonable Cause/Just and Proper"

The prevailing standard district courts in the Sixth Circuit employ when considering a § 10(j) petition is the "reasonable cause/just and proper" standard. Under this standard, the district court must find that (1) there is "reasonable cause" to believe that the employer engaged in unfair labor practices, and (2) injunctive relief is "just and proper." *NLRB v. Ky. May Coal Co.,* 89 F.3d 1235, 1239-40 (6th Cir. 1996) (citing *Fleischut,* 859 F.2d at 29). A district court also must be mindful that "[p]roceedings pursuant to § 10(j) are subordinate to the unfair labor practice proceedings to be heard before the Board." *Schaub,* 250 F.3d at 969 (citing *Fleischut,* 859 F.2d at 28). Consequently, it is not the job of

the district court, in considering a § 10(j) petition, "to adjudicate the merits of the unfair labor practice case." *Id.* (citing *Fleischut,* 859 F.2d at 28.)

The alleged violations at issue pertain to§ 8(a)(1), (3), and (5) of the NLRA, 29 U.S.C. § 158(a), which provides as follows:

It shall be an unfair labor practice for an employer--

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .;

. . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. § 158(a).

**1.    Reasonable Cause**

Petitioner's burden of showing "reasonable cause" is "relatively insubstantial," inasmuch as the proof requires only that the Board's legal theory underlying the allegations of unfair labor practices be "substantial and not frivolous" and that the facts of the case be consistent with the Board's legal theory. *Schaub,* 250 F.3d at 969 (quoting and citing *Fleischut,* 859 F.2d at 28, 29). This Court reviews the legal theory *de novo* and the facts for clear error. *Id.* (citing *Kobell,* 965 F.2d at 1407). In reviewing the supporting facts, a

district court "need not resolve conflicting evidence between the parties" or make credibility determinations. *Id.* (citations omitted). "Rather, so long as facts exist which could support the Board's theory of liability, the district court's findings cannot be clearly erroneous." *Id.* (citations omitted). Indeed, fact-finding is inappropriate in the context of a district court's consideration of a 10(j) petition. *Ky. May Coal Co.,* 89 F.3d at 1239.

Additionally, a "district court may rely upon both direct and circumstantial evidence to determine the motive of the employer with respect to the challenged conduct." *Schaub,* 250 F.3d at 970 (citing *NLRB v. Vemco, Inc.,* 989 F.2d 1468, 1477 (6th Cir. 1993)). For instance, "'the proximity in time between recent protected activity and measures taken against the employee engaged in the activity lend support to the inference of an unfair labor practice.'" *Id.* (quoting *Jim Causley Pontiac v. NLRB,* 620 F.2d 122, 125 (6th Cir. 1980)). We reiterate that review of the district court's "reasonable cause" determination comes under the clear error standard. *Frankel,* 818 F.2d at 493.

The statute at issue is § 8(a)(3) of the NLRA, which prohibits an employer from, "discriminati[ng] in regard to hire or tenure or employment to . . . discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). This Court has held that an employer's termination of an employee for engaging in union activity violates § 8(a)(3). *See Birch Run Welding & Fabricating, Inc. v. NLRB,* 761 F.2d 1175, 1179 (6th Cir. 1985).

The relevant question is whether the employer's termination of Sizemore, Gabbard, and Hutton was motivated by anti-union animus. *NLRB v. Cook Family Foods, Ltd.,* 47 F.3d 809, 816 (6th Cir. 1995). If Petitioner demonstrates that the termination was motivated at least in part by anti-union animus, the burden shifts to the Hospital to show that it would have fired the employee anyway. *NLRB v. Transp. Mgmt. Corp.,* 462 U.S. 393, 399-403 (1983).

We believe there is more than sufficient evidence in this record to demonstrate that the Hospital professed a strong anti-union animus, given evidence of supervisors' threats to fire strikers, the Hospital's generally hostile attitude toward the Union, its refusal to engage in collective bargaining, and its display of anti-union signs and use of surveillance during the strike. Moreover, Gabbard was terminated shortly after returning to work from the strike, and Sizemore and Hutton were terminated before they were even able to return to work. Finally, there is plenty of evidence tending to show the pretextual nature of the Hospital's reasons for firing each of the three employees. With respect to Sizemore, the Hospital claimed that Sizemore failed to follow the proper 15 day resignation notice policy, yet it is clear from her August 15, 2000 letter that she had not resigned but rather had requested a change in work status, which did not require 15 day notice. With respect to Gabbard, the existing policies indicated that an unexcused personal absence generally was penalized by methods short of termination, and indeed a similarly-situated person had not been terminated. Finally, the Hospital's misrepresentations with respect to Hutton, by suggesting that she made no effort to attend the videotape viewing, along with the Hospital's failure to communicate appropriate deadlines and/or to warn Hutton that not viewing the compliance videotape would result in termination, clearly demonstrated the lack of plausibility of its reasons for her discharge. Moreover, the ALJ's February 20, 2002 ruling lends further support to the validity of the district court's decision on these issues. Thus, reasonable cause is abundant with regard to these three terminations, and the district court did not clearly err with respect to its fact-finding on the reasonable cause issue.

As to the Hospital's changes to employees' break schedule after the strike, we agree with the district court that the law is well settled that an employer may not make changes to terms or conditions of employment without first affording the employee's bargaining representative notice and opportunity to negotiate regarding the proposed changes. *See NLRB v.*

*Katz*, 369 U.S. 736, 743 (1962); *NLRB v. Sanitary Bar & Burlap Co.,* 406 F.2d 750, 752 (6th Cir. 1969) (citations omitted). That was not done here and the district court properly found reasonable cause to believe the Hospital violated the NLRA by unilaterally changing the employees' break schedules after the strike. *See* 29 U.S.C. § 158(d).

**2.    Just and Proper**

However, finding reasonable cause is not sufficient–the remedy of a temporary injunction must also be just and proper. In other words, "[c]ourts must be mindful that 'the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power.'" *Schaub v. Detroit Newspaper Agency,* 154 F.3d 276, 279 (6th Cir. 1998) (citing *Gottfried v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 80,* 927 F.2d 926, 928 (6th Cir. 1991)). Thus, "[t]he 'just and proper' inquiry . . . turns primarily on whether a temporary injunction is necessary 'to protect the Board's remedial powers under the [NLRA].'" *Id.* (citing *Calatrello v. Automobile Sprinkler Corp. of America,* 55 F.3d 208, 214 (6th Cir. 1995)).

We hold that the district court did not abuse its discretion in finding interim reinstatement for the three employees to be "just and proper." As the district court noted, multiple terminations of striking employees directly following the end of the union strike would have an inherently chilling effect on other employees. *See Frankel,* 818 F.2d at 495-96 (noting the appropriateness of an interim reinstatement in the NLRB context because an alternative result "risk[s] a serious adverse impact on employee interest in unionization") (quoting *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d 1047, 1053 (2d Cir. 1980)); *see also Pascarell v. Vibra Screw,* 904 F.2d 874, 880 (3d Cir. 1990) (noting that the employer's discharge of the entire bargaining committee rendered the chilling effect on other non-activist employees "patent").

The four affidavits presented to the district court indicated that the terminations indeed did have a chilling effect on union activity, inasmuch as the employees stopped wearing union buttons, spoke in hushed tones about union activities, and feared reprisal. Some affidavits spoke of the low morale and overall sense that the Union could not assist them as reactions to the multiple firings closely following the strike.

It is also noteworthy that these three terminations represent the culmination of several months of severe hostility on the Hospital's part toward union activity, the strike, and any collective bargaining efforts. These are also relevant factors. *See Arlook In re NLRB v. S. Lichtenberg & Co.,* 952 F.2d 367, 373-74 (11th Cir. 1992) (noting that the history of management resistance to unionization, various unfair labor practices, and numerous discharges also supported interim relief to prevent further damage). Indeed, in this case, the Union was quite new and had not even signed its first contract, "mak[ing] bargaining units highly susceptible to management misconduct." *Id.* at 373.

The Hospital laundry list of various arguments against finding that the "just and proper" burden has been satisfied, but none of these arguments are particularly strong. We believe discussion of all of these arguments is unnecessary given our prior discussion in this case. Nevertheless, we shall briefly discuss some of the Hospital's arguments.

For instance, the Hospital complains that the district court did not adequately consider the special circumstances surrounding a health care facility's interest in maintaining quality patient care. Yet in this case none of these three employees were fired for defects in patient care. They were fired for failing to follow certain procedures completely unrelated to patient care issues. The district court did not engage in any lengthy discussion about patient care interests because the facts in this case did not merit such discussion.

The Hospital also complains that the affidavits did not reference the affiants' knowledge of Sizemore and Hutton's discharges; they only referenced Gabbard's discharge. Thus, the Hospital claims, no proof had been submitted that Sizemore and Hutton's terminations actually created a chilling effect on the other employees. However, this argument ignores the fact that there were other reasons supporting a "just and proper" finding; for instance, the district court determined that the terminations themselves were inherently chilling inasmuch as the reasons provided were pretextual. The Hospital fails to persuade us on this argument.[3]

The Hospital also argues that the "just and proper" burden cannot be established for Sizemore because granting an injunction seeks to restore the status quo, and because Sizemore never actually held the PRN position before she was terminated, she could only be returned to her old position. We find this argument meritless based on our previous discussion of the "just and proper" standard.

We conclude, therefore, that the district court did not abuse its discretion in finding that Petitioner met the burden to show that interim relief was just and proper.

---

[3]The Hospital also complains that the affidavits should never have been received in evidence anyway inasmuch as some of them contained hearsay. However, this argument is placed in a footnote and the brief provides no legal support for this argument. We do not believe the Hospital has properly placed this issue into contention for purposes of this appeal. To the extent that the Hospital seeks to incorporate by reference its arguments from the district court brief, this attempt fails. *See Northland Ins. Co. v. Stewart Title Guar. Co.,* 327 F.3d 448, 452 (6th Cir. 2003) ("The incorporation by reference of arguments made at various stages of the proceeding in the district court does not comply with the Federal Rules of Appellate Procedure" and therefore such arguments are waived).

**III.**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.