24-3324-cv
*Poor v. Parking Systems Plus, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2025

(Argued: October 8, 2025      Decided: December 19, 2025)

Docket No. 24-3324-cv

TERESA POOR, Regional Director of Region 29
of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR RELATIONS BOARD,

*Petitioner-Appellant*,

*- against -*

PARKING SYSTEMS PLUS, INC.,

*Respondent-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Before:

CALABRESI, CHIN, and LEE, *Circuit Judges*.

Appeal from an order of the United States District Court for the Eastern District of New York (Brown, *J.*) denying an application by the Regional Director of the National Labor Relations Board for a temporary injunction under § 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), against respondent employer, a parking management company. The district court issued a four-sentence text order denying the requested injunction, which would have prohibited the employer from engaging in unfair labor practices and ordered the reinstatement of certain discharged employees. The Regional Director appeals, arguing that the text order violated Rule 52(a)(2) and that this Court should reverse because she has made the necessary showing for a § 10(j) injunction.

REVERSED and REMANDED for entry of the requested injunction.

---

CHAD A. WALLACE, Attorney (William B. Cowen, Acting General Counsel, Stephanie Cahn, Acting Deputy General Counsel, Kayce R. Compton, Associate General Counsel, Richard J. Lussier, Deputy Associate General Counsel, Robert N. Oddis, Assistant General Counsel, Laurie Monahan Duggan, Deputy Assistant General Counsel, *on the brief*), National Labor Relations Board, Washington, D.C., *for Petitioner-Appellant.*

MICHAEL JAMES MAURO, Milman Labuda Law Group, PLLC, Lake Success, NY, *for Respondent-Appellee.*

CHIN, *Circuit Judge*:

Petitioner Teresa Poor, Regional Director of the National Labor Relations Board (the "Board"), appeals from an order of the United States District Court for the Eastern District of New York (Brown, *J.*), denying her petition for a temporary injunction against Respondent Parking Systems Plus ("Parking Systems") under § 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j).

The district court entered a four-sentence text order denying the injunction, stating that Poor had "failed to articulate any cognizable irreparable harm." Joint App'x at 25. We conclude that the district court's text order fails to comply with Rule 52(a)(2) of the Federal Rules of Civil Procedure. We further conclude that Poor has made the necessary showing for a § 10(j) injunction under the four-part test governing such analyses, as set forth in *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). We therefore REVERSE and REMAND for entry of the requested injunction.

## BACKGROUND

### I. *Factual Background*

When reviewing a grant or denial of injunctive relief, we are generally bound by a district court's findings of fact. *See Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364 (2d Cir. 2001). But "where [a] district court fail[s] to make any findings of fact under Rule 52(a), we do not think that we are thereby foreclosed from examining the record to determine if sufficient allegations or sufficient evidence supports the district court's injunctive ruling." *Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 848 n.1 (2d Cir. 1996) (citation modified) (citing *Sampson v. Murray*, 415 U.S. 61, 86 n.58 (1974)); *see also Genovese Drug Stores, Inc. v. Conn. Packing Co.*, 732 F.2d 286, 292 (2d Cir. 1984) (vacating, based "[o]n the undisputed facts," a district court's entry of preliminary injunction). Accordingly, in assessing whether the district court abused its discretion by denying the requested injunction, we draw our facts from what is undisputed in the record before the district court, and note where the parties have offered conflicting factual assertions.

Additionally, insofar as we go further than merely reviewing the decision below for abuse of discretion and independently address whether the

- 4 -

requested injunction is appropriate, we are not limited to the undisputed facts in the record before the district court. Subsequent to the district court's ruling, an Administrative Law Judge ("ALJ"), having held a trial in this matter, issued a decision on the unfair labor practice charges underlying Poor's § 10(j) request. *See* App'x at 4. In that decision, the ALJ resolved several key factual disputes using fact- and inference-based assessments of the credibility of witnesses who testified at trial. *Id.* at 19. Where an ALJ has resolved factual disputes based on the same record as what was before a district court, we may ask, in assessing the propriety of § 10(j) relief, whether "the Board will reject the ALJ's credibility assessments or overturn the findings that depend on those assessments" on review. *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 338 (2d Cir. 1999). Accordingly, we may rely on the ALJ's factual findings, even those related to issues the parties dispute, when reviewing Poor's likelihood of success on the merits. *See id.*

### A. *Parking Systems Wins the Stony Brook Bid*

Stony Brook Hospital ("Stony Brook") is a public medical center located in Stony Brook, New York. It contracts with vendors to provide valet parking to hospital patients and visitors. Stony Brook's valet parking contract

was held by Classic Valet Parking ("Classic") from 2015 to 2023. Classic's employees, called "valet attendants," voted in 2015 to make Local 1102 Retail, Wholesale & Department Store Union, United Food and Commercial Workers (the "Union") their exclusive bargaining representative. Beginning in 2015, the Union and Classic entered into successive collective bargaining agreements ("CBAs"), the most recent of which remained in force through October 31, 2025.

In 2023, Stony Brook solicited proposals from vendors to take over the valet parking contract. The contract was awarded to Parking Systems, a parking management company that employs around 1,000 employees and operates at over 250 locations across Long Island and the greater Tri-State area. When Parking Systems won the bid, the collective bargaining unit at Stony Brook represented 34 of Classic's valet attendants. The parties dispute whether Parking Systems leadership knew that Classic's employees were unionized when they submitted their bid, though Parking Systems acknowledges that it did not calculate its bid using union wage rates.

B.      *Parking Systems Recruits, then Declines to Hire Classic Employees*

In the months between winning the bid and assuming operations, leadership at Parking Systems contemplated whether to retain the Classic

- 6 -

employees who were already working at Stony Brook. In internal emails sent in October 2023, Parking Systems leaders expressed interest in doing so, with one manager saying that "the biggest domino right now" was "contact[ing] members of [Classic's] staff" to "figure out how many we're retaining." Joint App'x 107-08. Then, in early November, the Union's attorney emailed Parking Systems to request that it retain Classic's employees, recognize the Union, and assume the CBA. Parking Systems leaders forwarded the email to their lawyer, but never responded to the Union. The next day, a Parking Systems manager calculated the cost of hiring Classic's employees at union wages and expressed concern that its bid was already "close to the bone" in terms of profitability. App'x at 28. Nevertheless, Parking Systems actively recruited Classic employees through mid-November 2023. Managers visited Stony Brook, spoke to Classic employees working at the lot, and distributed business cards containing QR codes linking to Parking Systems' job application form.

Over the next month, however, it became clear that Parking Systems did not intend to hire any Classic employees even though the positions remained unfilled. Many Classic employees reported using the QR codes to fill out job forms, but none heard back about their applications.

In internal emails, a Parking Systems manager wrote of the Classic employees: "They are 35 lost soul attendants chatting with no info." Joint App'x at 113. Another replied that "the staff currently working . . . will be out of work in December. We have to be careful of our messaging because they can't have walk outs in the last 10 days or so." *Id.* At the same time Parking Systems seemingly decided that it would not hire any Classic employees, it also posted an "urgently hiring" job listing for a "Parking Lot Attendant" at Stony Brook Hospital. *Id.* at 104.

Despite its general refusal to hire Classic employees, Parking Systems was very interested in one particular Classic valet -- Francis Gil Reyes, a "standout employee" who had been working at Stony Brook since 2015. *Id.* at 66. At Reyes's interview on November 25, 2023, Parking Systems offered her a job, but noted that it was a "singular offer" and that it would not be hiring other Classic employees. *Id.* Reyes testified at a hearing before the ALJ that, when she asked why Parking Systems was not interviewing other employees, Parking Systems part-owner Bobby Gust responded: "Because [the employees] worked with the Union and . . . [t]he company didn't work with the Union." *Id.* at 35. Reyes then turned down the job because, as she later testified, she "didn't feel

comfortable that he just want to hire me and not the other co-workers, because . . . we all belong to a union, and . . . we've been working together for a long time." Joint App'x at 34. Two days after the interview, Reyes texted the Union's business agent Ayse Porsuk that "the new parking system company does not want to hire us because we have a union and they do not work with the union." *Id.* at 86.[1]

For its part, Parking Systems disputes that anti-union statements were made at the meeting with Reyes. When asked at the ALJ hearing whether he had told the former Classic employees that Parking Systems would not hire them because they were unionized, Gust testified that he "absolutely did not." *Id.* at 77. Similarly, when asked whether he had stated that he "halt[ed] the employees' employment on the condition of them abandoning the Union," Gust testified: "I did not say that. I did not imply that. *Id.*[2]

C.      *Parking Systems Assumes Operations at Stony Brook*

Parking Systems took over valet parking operations from Classic on December 1, 2023. The parties offer different characterizations of the transition.

---

[1] Reyes's text to Porsuk was originally in Spanish.
[2] As discussed below, *see infra* pp. 14-15, the ALJ credited Reyes's testimony over Gust's testimony in this respect.

Poor argues that Parking Systems simply replaced Classic in providing valet

parking services at the same Stony Brook parking lots, pointing to an admission

by Parking Systems part-owner Bobby Gust that it "continued to operate

substantially the same parking service operation as existed under Classic Valet."

*Id.* at 50.  Parking Systems argues that it "operates very differently" than Classic

because it changed the locations of the valet stations, opened a new lane that

requires traffic facilitation, and implemented different key handling and revenue

collection procedures.  Appellee's Br. at 21.

Parking Systems did not hire any former Classic employees when it

began operating at Stony Brook.  Its current employees are not unionized.  The

former Classic employees told Porsuk, the Union business agent, that they lost

faith in the Union after losing their jobs.  Porsuk stated that she believed the

former employees would return to Stony Brook if offered reinstatement, though

most have since found new jobs.

## II.    *Procedural Background*

On December 4, 2023, the Union filed an unfair labor practice charge

against Parking Systems before the Board.  After investigating the charge, Poor --

as Regional Director of Region 29 of the Board -- issued a complaint before an

ALJ on April 23, 2024. ALJ Benjamin Green conducted a trial on the allegations in the complaint between June 18, 2024 and July 24, 2024, at which he received witness testimony and documentary evidence.

During the pendency of the proceedings before the ALJ, Poor sought an interim preliminary injunction in the district court below pursuant to § 10(j) of the Act. Section 10(j) injunctions are a statutorily authorized solution to a timing problem. Because agency adjudications often proceed at a "notoriously glacial" pace, by the time the Board resolves an unfair labor practice charge and issues remedial relief, employers have often already accomplished their unlawful objectives, rendering the Board's order ineffective. *See McKinney*, 602 U.S. at 359 (Jackson, J., concurring in part) (quoting *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir. 1989)); *see also Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980). In light of this problem, Congress gave the Board the power to seek an interim injunction during the pendency of agency proceedings to "preserv[e] or restor[e] the status quo as it existed before the onset of the unfair labor practices." *McKinney*, 602 U.S. at 359 (Jackson, J., concurring in part) (quoting *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1575 (7th Cir. 1996)).

Under § 10(j), the Board may, upon the issuance of a complaint, petition a district court for "appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). While the district court considers the § 10(j) petition, the underlying unfair labor practices claim proceeds through the administrative adjudication process -- first review by an ALJ, then appeal to the Board, and lastly enforcement by a federal court of appeals. 29 U.S.C. § 160(b)-(c); (e)-(f); *see also McKinney*, 602 U.S. at 343.

Poor filed her § 10(j) petition and moved for a hearing on October 7, 2024. She requested an injunction ordering Parking Systems to, among other things, reinstate the former Classic employees without prejudice to any rights and privileges previously enjoyed, recognize the Union, begin good-faith negotiations, and upon request by the Union, rescind any or all unilateral changes that Parking Systems implemented at or since the time it took over operations. The petition argued that the Board was likely to succeed in proving that Parking Systems violated three provisions of the Act: threatening to refuse to hire employees because of their union affiliation or conditioning their employment on abandoning their union under § 8(a)(1); refusing to hire employees because of their union affiliation under § 8(a)(3); and refusing to

recognize or bargain with the union under § 8(a)(5).  *See* 29 U.S.C. § 158(a)(1), (3), (5).  Poor also argued that, absent injunctive relief, irreparable harm would result to the "national policy protecting workers' right to unionize, to the rights of [Parking Systems'] employees and former Classic employees, and to the public interest."  Joint App'x at 11-12.

The district court denied the petition and motion for a hearing in a four-sentence text order.  The entirety of the order, entered November 14, 2024, read:

> Having failed to articulate any cognizable irreparable harm -- the *sine qua non* of preliminary relief -- plaintiff has failed to meet the demanding standard for the issuance of a preliminary injunction.  Notably, plaintiff has already sought the very same relief before an Administrative Law Judge, and seeks the same remedy here as in their filings in that proceeding, which remain *sub judice.*  Additionally, the timing of plaintiff's filings, some eight months after the acts complained of, raises the specter of delay, which strongly weighs against the relief sought.  Thus, the motion for a preliminary injunction is DENIED.

*Id.* at 25.  This appeal followed.

After the order but before the parties submitted briefing in this appeal, the ALJ issued his decision in the underlying case.  On January 24, 2025, the ALJ found that Parking Systems violated § 8(a)(3) by refusing to hire Classic

- 13 -

employees because they were represented by the Union, and § 8(a)(5) by refusing to recognize and bargain with the Union and by unilaterally changing the employees' terms of employment in contravention of the operative Classic CBA. The ALJ recommended dismissing certain § 8(a)(1) charges, however, because he did not find that Parking Systems had conditioned employment on Classic employees abandoning the Union. Parking Systems has filed exceptions to the ALJ decision, which are now pending before the Board.

The ALJ's finding of anti-union discrimination rested, in part, on his resolution of the "primary credibility dispute in this case" -- "whether, during the November 25 interview of Gil Reyes, Account Executive Gust said the Respondent could not hire all the Classic employes because the company does not work with the Union or unions." App'x at 19. Based on a combination of documentary evidence, observation of witness testimony, and inferential logic, the ALJ found Reyes more credible than Parking Systems as to these statements. *Id.* at 20. Additionally, independent of the disputed statements made at the Reyes meeting, the ALJ also found support for his finding of anti-union discrimination in Parking Systems' "failure to offer a convincing rationale for

refusing to hire Classic employees" after initially indicating an intent to do so. *Id.* at 27.

On appeal, Poor only seeks appellate review and relief as to the sustained § 8(a)(3) and (5) violations.

*DISCUSSION*

We begin with a discussion of whether the district court's four-sentence text order violates the requirements of Rule 52(a). Finding that it does, we then turn to the merits of Poor's § 10(j) petition, and conclude that she has made a sufficient showing under all four prongs of the standard governing § 10(j) injunctions following *McKinney.*

## I.    *Rule 52(a)*

Rule 52(a) states: "In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2). "A principal purpose" of Rule 52(a) "is to allow appellate review of the district court's decision." *NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995). Accordingly, a district court's "findings and conclusions should provide a clear understanding of the basis of the trial court's decision." *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d

357, 364 (2d Cir. 2003). Orders containing only conclusory statements about the preliminary injunction factors are insufficient to satisfy Rule 52(a). *See, e.g., Alleyne v. N.Y. State Educ. Dep't*, 516 F.3d 96, 101 (2d Cir. 2008) (per curiam) (finding Rule 52(a) violation where order identified correct legal standard for injunction, "but does not make any findings as to whether [the movants] are 'likely' to succeed on the merits of their claims").

The district court's four-sentence text order plainly violates Rule 52(a). The order summarily states that Poor "failed to articulate any cognizable irreparable harm," without any explanation or discussion. Joint App'x at 25. This is the exact kind of unsupported, conclusory statement that is insufficient to satisfy Rule 52(a). *See Romer v. Green Point Sav. Bank*, 27 F.3d 12, 16 (2d Cir. 1994) (finding Rule 52(a) violation where order "contained no findings of fact or substantive conclusions of law, beyond stating the Plaintiffs were 'likely to suffer irreparable harm' and 'have a likelihood of success on the merits'"); *Tekkno Lab'ys, Inc. v. Perales*, 933 F.2d 1093, 1097 (2d Cir. 1991) (finding violation where order only "stated in conclusory terms . . . that [the movant] had demonstrated irreparable harm and . . . a likelihood of success on the merits"). The only arguable "finding" made by the district court is a single sentence stating that "the

timing of plaintiffs' filings . . . raises the specter of delay, which strongly weighs against the relief sought." Joint App'x at 25. But this conclusory statement, which provides no discussion of the reasons for the delay or the harm resulting from it, does not provide a sufficient basis to evaluate the district court's rationale for denying Poor's request for injunctive relief. *See Alleyne*, 516 F.3d at 101 (noting that district court's sparse order makes it "difficult to identify specific findings as to harm or likelihood of success").

The district court's failure to comply with Rule 52(a) is non-jurisdictional. *See Hsu ex rel. Hsu*, 85 F.3d at 848 n.1. We therefore are not precluded from proceeding to review the merits of the court's decision to deny the injunction. *Id.* While we typically vacate a district court's injunctive order and remand for specific findings in this posture, *see NAACP*, 70 F.3d at 223, we "may proceed with appellate review despite inadequate findings if we are able to discern enough solid facts from the record to permit us to render a decision." *Davis v. N.Y.C. Hous. Auth.*, 166 F.3d 432, 436 (2d Cir. 1999). Here, we have the entire record as presented before the ALJ and the district court -- including hundreds of pages of affidavits, exhibits, and hearing transcripts -- from which

we "discern enough solid facts" to review the injunction determination on the merits.

## II. *Failure to Apply the* **Winter** *Standard*

We review a § 10(j) injunction ruling for abuse of discretion, but all underlying conclusions of law *de novo*. *Inn Credible Caterers*, 247 F.3d at 364; *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 484 (2d Cir. 2007). Poor argues that the district court failed to state or apply the correct legal standard in its four-sentence text order. We take this opportunity to clarify the law that governs a district court's analysis of whether a § 10(j) injunction should issue given the Supreme Court's recent decision in *McKinney*.

Prior to *McKinney*, this Court applied a two-prong test to evaluate § 10(j) petitions, asking (1) whether there is "reasonable cause" to believe that an unfair labor practice was committed, and (2) whether injunctive relief is "just and proper." *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 468-69 (2d Cir. 2014). The Supreme Court in *McKinney* rejected an analogous two-prong test adopted by the Sixth Circuit, holding instead that the traditional four-part test for preliminary injunctions applies to § 10(j) petitions because the text of the Act did not displace the "traditional equitable principles" guiding the provision of

- 18 -

injunctive relief. *McKinney*, 602 U.S. at 348. In light of this holding, we apply the traditional four-prong test to assess whether to grant or deny a § 10(j) petition. Under that test, as articulated in *Winter*, 555 U.S. at 20, the Board must show that it is "likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *McKinney*, 602 U.S. at 346 (quoting *Winter*, 555 U.S at 20, 22).

Poor contends that the district court committed legal error by failing to apply *Winter*, and that it misinterpreted the significance of the parallel proceedings before the ALJ. Indeed, the district court did not cite either *McKinney* or *Winter*. Moreover, the order noted that Poor "already sought the very same relief before an Administrative Law Judge, and seeks the same remedy here as in their filings in that proceeding, which remain *sub judice*." Joint App'x at 25. We agree with Poor that, to the extent the court's denial of injunctive relief was based on this reasoning, that reliance is in error. The existence of a pending ALJ proceeding does not render a § 10(j) petition redundant. Rather, this dual-track mechanism -- a § 10(j) petition proceeding before a district court while the merits proceed before an ALJ -- is precisely what

- 19 -

Congress established in the Act. And federal courts have often granted § 10(j) injunctions even *after* an ALJ decision has been issued, in recognition that interim relief is needed because ALJ decisions may still be appealed to the Board, as is the case here. *See, e.g.*, *Silverman*, 196 F.3d at 337-38; *Inn Credible Caterers Ltd.*, 247 F.3d at 368. In any event, we conclude that Poor has made a sufficient showing under all four prongs of that test to warrant the preliminary injunctive relief that § 10(j) affords.

## III. *The Denial of Injunctive Relief*

We may reverse a district court's denial of injunctive relief where the court abused its discretion. *See Poor v. Amazon.com Servs. LLC*, 104 F.4th 433, 440 (2d Cir. 2024). "Although reversal of an order denying an application for a preliminary injunction is customarily accompanied by a directive that the district court conduct a new hearing on remand," we may instead "direct the district court to issue the injunction" if we find a plaintiff's arguments meritorious. *Patton v. Dole*, 806 F.2d 24, 31 (2d Cir. 1986).

### 1. Likelihood of Success on the Merits

Under *Winter*'s first prong, the Board must "make a clear showing that it is likely to succeed on the merits." *McKinney*, 602 U.S. at 349 (citation

modified).  But unlike a traditional preliminary injunction, a district court analyzing a § 10(j) petition does not make a "predictive judgment about how it will rule on the merits itself.  Instead, the court is predicting the future decision of the Board." *McKinney*, 602 U.S. at 363 (Jackson, J., concurring in part).  This Circuit has alternatively described the inquiry as the likelihood that "a Board decision finding an unfair labor practice will be enforced by a Court of Appeals" -- the only enforcement mechanism provided for by the Act.  *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir. 1980).[3]

After the district court issued its text order in this case, the ALJ issued its decision finding that Parking Systems violated § 8(a)(3) and § 8(a)(5).  While "we do not sit in review of the ALJ's decision," it provides a "useful benchmark against which the Director's prospects of success [before the Board] may be weighed." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001).  Where an ALJ has made determinations based on the same record as what was before a district court, we ask whether "the Board will reject the ALJ's

---

[3] Of course, predicting a future decision of the Board is different from predicting whether such a decision will be enforced by a Court of Appeals.  But given the deference owed by the Courts of Appeals to the Board's factual findings and legal interpretations, these inquiries will generally converge.  *See McKinney*, 602 U.S. at 364 (Jackson, J., concurring in part).

credibility assessments or overturn the findings that depend on those assessments" on review. *Silverman*, 196 F.3d at 338.

On appeal, Poor argues that she has made a clear showing of success as to the § 8(a)(3) and § 8(a)(5) violations. We agree that Poor is likely to succeed on the merits of these claims before the Board.

### a. § 8(a)(3) Refusal to Hire

Section 8(a)(3) makes it an unfair labor practice for an employer to encourage or discourage membership in a union by discriminating in hiring or other employment decisions. 29 U.S.C. § 158(a)(3). Poor argues she is likely to succeed in showing that Parking Systems violated § 8(a)(3) by refusing to hire the former Classic employees due to their union membership. We agree.

We assess failure to hire claims under the *Wright Line* burden-shifting framework. *See Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981), *cert. denied*, 455 U.S. 989 (1982); *Pergament United States, Inc. v. NLRB*, 920 F.2d 130, 137-39 (2d Cir. 1990) (applying *Wright Line* to failure to hire claim). Under *Wright Line*, the Board must first show that "antiunion animus contributed to the employer's [hiring] decision." *Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Greenwich Collieries*, 512 U.S. 267, 276 (1994). Anti-union motive may be inferred from circumstantial evidence, such as "the

employer's knowledge of the employees' union activities, the timing of the [failure to hire], or other antiunion activity by the employer." *Bozzuto's Inc. v. NLRB*, 927 F.3d 672, 683 (2d Cir. 2019) (citation modified). Once an animus showing is made, the burden shifts to the employer to "establish as an affirmative defense that it would have [declined to hire] the employee for permissible reasons even if the employee had not been involved in union activity." *Greenwich Colleries*, 512 U.S. at 276.

Poor is likely to succeed under *Wright Line.* There is sufficient evidence, including internal emails, to show that Parking Systems initially intended to hire Classic employees, then changed its tune once it discovered their union affiliation. Parking Systems leadership discussed "figur[ing] out how many [Classic employees] we're retaining" in internal emails on October 24, 2023, and then calculated the cost of hiring Classic employees at union wage rates the day after being contacted by the Union representative. Even after being warned that the bid was "close to the bone," management actively recruited Classic employees by giving them QR codes linked to job application forms. App'x at 28. But Parking Systems' approach had evidently turned by the time managers told Reyes no other Classic employees would be considered because they

"worked with the Union and . . . [t]he company didn't work with the Union," which certainly points to anti-union animus.[4]  Joint App'x at 35; *see also NLRB v. Staten Island Hotel Ltd. P'ship*, 101 F.3d 858, 861 (2d Cir. 1996) (per curiam) (upholding finding of anti-union animus from statements such as manager saying that the employer "wasn't going to hire anybody from the union").  True to its word, Parking Systems did not hire any Classic employees, despite posting that it was "urgently hiring" for the same unfilled roles.  Joint App'x at 104.

These undisputed facts also directly contravene Parking Systems' primary affirmative defense, which is that it had a company policy of not hiring a predecessor's employees.  The October 24 internal emails and the fact that Parking Systems distributed job applications to the Classic employees undermine Parking Systems' argument that it never intended to hire Classic employees at all.  Taking these facts together, Poor can likely show that the employees' union

---

[4] As noted previously, Parking Systems disputes that these statements were made.  But the ALJ found Reyes, not Parking Systems, credible.  And because we are conducting our own § 10(j) merits analysis -- not merely reviewing that of the court below -- it is appropriate to give deference to the ALJ's credibility assessment, even though it post-dated the district court's decision.  Moreover, even if Parking Systems did not express anti-union animus at the Reyes meeting -- that is, if Reyes was lying -- Parking Systems' decision not to hire the unionized employees after initially indicating an intent to do so is sufficient on these particular facts to establish prima facie anti-union animus under *Wright Line*.  It follows that even the undisputed facts are sufficient to demonstrate likely success on the merits.

affiliation contributed to Parking Systems' decision not to hire them, and Parking Systems is unlikely to succeed in rebutting this inference of anti-union animus.

### b. § 8(a)(5) Failure to Bargain

An employer violates § 8(a)(5) if it "refuse[s] to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). We conclude that Poor is likely to succeed before the Board on this claim as well.

A new employer assumes an obligation to bargain with the union of its predecessor's employees if it is in "legal successorship relation" with its predecessor -- that is, if (1) there is "substantial continuity" between the two employers and (2) a majority of the new workforce were employees of the predecessor. *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 280-81 (1972); *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43, 47 (1987); *accord Inn Credible Caterers*, 247 F.3d at 365. Here, the second element is likely met. Where a putative successor fails to hire predecessor employees due to anti-union discrimination, the Board has long adopted a presumption that but for such discrimination, the putative successor would have retained predecessor employees as a majority of its workforce. *See Pressroom Cleaners & Serv. Emps.*

*Int'l Union, Loc. 32BJ*, 361 NLRB 643, 643 (2014).[5]  Here, Poor can likely establish

that Parking Systems failed to hire a majority of Classic's employees because of

their union membership, *see supra* § III.1.a.  We may therefore presume that, but

for this discriminatory motive, Parking Systems would have retained the

majority of Classic's employees.  *See id.*  Poor's likelihood of successfully showing

a failure to bargain violation thus turns on the first element: whether there was

"substantial continuity" between Classic and Parking Systems.

"Substantial continuity" is a factual inquiry based on the totality of

the circumstances.  *Fall River Dyeing*, 482 U.S. at 43.  Courts consider "whether the

business of both employers is essentially the same; whether the employees of the

new company are doing the same jobs in the same working conditions under the

same supervisors; and whether the new entity has the same production process,

produces the same products, and basically has the same body of customers."  *Id.*

Critically, substantial continuity is evaluated from the perspective of the

employees -- the key inquiry is whether employees "view their job situations as

---

[5] Our Court has reasoned along similar lines.  *See The Staten Island Hotel Ltd. P'ship*, 101 F.3d at 861-62 (upholding the Board's remedial order by resolving uncertainty over whether the successor would have retained the predecessor's employees under prior wages against the employer, because "it was the [employer's] discriminatory acts that created the uncertainty as to what terms and conditions of employment would have been agreed . . . .").

essentially unaltered," thus creating a legitimate expectation of continued representation by their union. *Id.*; *see also NLRB v. DeBartelo*, 241 F.3d 207, 210-11 (2d Cir. 2001).

Poor can likely show that there was substantial continuity between Classic and Parking Systems. Both provided the same valet parking services at the same lots at Stony Brook, with one Parking Systems manager agreeing that it "continued to operate substantially the same parking service operation as existed under Classic Valet, including serving the same types of hospital parking needs." App'x at 50. The changes Parking Systems introduced, such as switching key handling procedures and the location of valet stations, were "minor operational changes" that did not destroy substantial continuity. *See Allways E. Transp., Inc. & Int'l Bhd. of Teamsters, Loc. 445*, 365 NLRB 686, 688 (2017). There is nothing in the record suggesting that these changes would alter the "employees' job situation [such] that they would change their attitudes about being represented" by the Union. *Id.* at 688 (citation modified). And indeed, from the perspective of the employees, valet attendants under both employers "performed essentially the same jobs in essentially the same facilities with the same general public." *Inn Credible Caterers*, 247 F.3d at 366.

Finally, the "substantial continuity" prong also requires that "the bargaining unit that [the] union seeks to represent remains appropriate under the successor's operations." *Banknote Corp. of Am. v. NLRB*, 84 F.3d 637, 642 (2d Cir. 1996) (citation modified); *see Burns*, 406 U.S. at 280-81. Parking Systems argues that the single facility bargaining unit at Stony Brook is no longer "appropriate" because Parking Systems interchanges its employees between the over 250 job sites it operates.

"[T]he Board has long treated a unit limited to a single facility as presumptively appropriate," even when a particular unit is part of a multi-facility operation. *Serv. Emps. Int'l Union, Loc. 32BJ v. NLRB*, 647 F.3d 435, 449 (2d Cir. 2011). In such circumstances, employers must meet a "heavy evidentiary burden . . . to show that historical units are no longer appropriate," because historical bargaining relationships "will not be disturbed where they are not repugnant to the Act's policies." *Banknote Corp. of Am.*, 315 NLRB 1041, 1043 (1994), *enforced*, 84 F.3d 637, 647 (2d Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997). A successor employer can rebut the "single-facility presumption" if it demonstrates that "the functional integration between the single facility and successor's other operations is so substantial as to negate the separate identity of the single-facility

unit." *Serv. Emps. Int'l Union, Loc. 32BJ*, 647 F.3d at 449 (citation modified).

Whether units are functionally integrated depends on their "geographic proximity, similarity of skills and functions, similarity of employment conditions, centralization of administration, managerial and supervisory control, employee interchange, functional integration of the employer, and bargaining history." *Staten Island Univ. Hosp. v. NLRB*, 24 F.3d 450, 454 (2d Cir. 1994).

Parking Systems is unlikely to succeed in rebutting the single-facility presumption as to the Stony Brook unit. By the time Parking Systems assumed operations at Stony Brook, the Union had been representing the single-facility bargaining unit at the hospital for over eight years, subjecting Parking Systems to the "heavy evidentiary burden" of proving that a historical unit has been rendered inappropriate. *See Banknote Corp. of Am.*, 315 NLRB at 1043**.** Parking Systems argues that its 250 job sites are functionally integrated because it interchanges employees between locations and maintains a centralized staffing system. But Stony Brook -- like Parking Systems' other locations -- has a single, dedicated site manager and account representative. There is little evidence in the record that Parking Systems has any specific plans to send valets from Stony Brook to other sites, or how often this would occur. And most notably, the only

one of Parking Systems' job sites that is currently unionized is represented by a single-facility bargaining unit, undercutting its argument that a similar historical unit would be inappropriate here.

Poor is therefore likely to show that Parking Systems is a legal successor to Classic, and thus had an obligation to bargain with the Union. Parking Systems does not contend that it has done so, making Poor likely to succeed on the merits of her § 8(a)(5) claim.

### c. § 8(a)(5) Unilateral Setting of Terms and Conditions

Poor alleges that Parking Systems committed a second violation of § 8(a)(5) by unilaterally instituting terms of employment different from those under Classic's CBA without bargaining with the Union. She argues that she is likely to prevail on the merits of this claim as well, and again, we agree.

Even if a new employer is found to be a legal successor to the old, there is a related question of *when* its obligation to bargain with an incumbent union attaches. In general, legal successorship -- and the corresponding duty to bargain -- cannot be ascertained until a putative successor has hired a "substantial and representative complement" of its workforce. *Fall River Dyeing*, 482 U.S. at 47-52; *accord Inn Credible Caterers*, 247 F.3d at 365. Therefore, when making initial hires, a new employer is usually not bound by its predecessor's

CBA and is free to set terms and conditions of employment unilaterally. *See Burns*, 406 U.S. at 284. But in cases where it is "perfectly clear" from the outset "that the new employer plans to retain all of the employees in the unit," legal successorship and the duty to bargain attach at the very outset of succession -- that is, before the effectuation of any hiring decisions. *Id.* at 294-95. And because unilateral changes as to mandatory subjects of bargaining are forbidden during CBA negotiations, *see NLRB v. Katz*, 369 U.S. 736, 737 (1962), successor employers in "perfectly clear" cases are not permitted to deviate unilaterally from the terms and conditions of their predecessors' CBAs.

This case falls under the "perfectly clear" exception. Under longstanding Board precedent, affirmed by several Courts of Appeals, the "perfectly clear" exception applies automatically to cases where legal successorship is based not on *actual* majority-union retention, but rather on the presumption that a majority union workforce would have been retained but for a successor's anti-union discrimination in hiring. *See Love's Barbeque Rest. No. 62*, 245 NLRB 78, 82 (1979), *enforced in relevant part sub nom. Kallmann v. NLRB*, 640 F.2d 1094, 1102-03 (9th Cir. 1981); *Cap. Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1008 (D.C. Cir. 1998); *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 374 (5th

Cir. 2017); *Pace Indus., Inc. v. NLRB*, 118 F.3d 585, 593-94 (8th Cir. 1997); *U.S.*

*Marine Corp. v. NLRB*, 944 F.2d 1305, 1320 (7th Cir. 1991) (en banc).  As a result,

Parking Systems was bound by Classic's CBA from the outset.

This principle is supported by the reasoning of this Court's prior

decisions in which we have upheld relief under the Act where a majority of the

predecessor's employees would have been retained but for the successor's

unlawful discrimination, and a successor employer unilaterally alters the

predecessor's terms.  *See The Staten Island Hotel Ltd. P'ship*, 101 F.3d at 861-62.  In

*Staten Island Hotel*, a successor employer found liable for anti-union

discrimination argued that a Board order binding it to the terms and conditions

of its predecessor's CBA was "impermissibly punitive."  *Id.* at 862.  We rejected

this argument and upheld the Board's authority to impose this backpay remedy

for two reasons.  First, we reasoned that the imposition of the predecessor's CBA

was "temporally limited: the Board's order require[d] payment at the prior rates

only until the Company negotiate[d] in good faith with the Union, either to

agreement or to impasse."  *Id.*  The same is true here, especially given that

Classic's CBA expired at the end of October and is now ripe for re-negotiation.

Second, we reasoned that because it was "hardly clear what terms would have

been reached had the Company not so discriminated" -- and "[b]ecause it was the Company's discriminatory acts that created [this] uncertainty" -- the fairest result was for the "wrongdoer to bear the risk of the uncertainty which its own wrong created." *Id.* (citation modified). The same applies *a fortiori* here, where the remedy at issue is a § 10(j) injunction modestly restoring the status quo prior to Parking Systems' "discriminatory acts."

Accordingly, we conclude that Poor is likely to succeed in showing that Parking Systems violated § 8(a)(5) of the Act by unilaterally setting initial terms without first bargaining with the Union.

### 2. Irreparable Harm

Although *McKinney* abrogated our framework for analyzing the merits of a § 10(j) petition, it did not disturb our precedents' reasoning as to what constitutes harm justifying a grant of equitable relief. Indeed, many of our pre-*McKinney* cases considered the import of irreparable harm, albeit under different nomenclature. *See, e.g., Inn Credible Caterers*, 247 F.3d at 368 (reasoning, under the prior test, that "injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo"). Now, under *Winter*, we continue to assess "traditional equitable principles governing

injunctive relief" with an eye toward "apply[ing] them in the context of federal labor laws." *Id.* at 368.

The district court order summarily stated that Poor failed to "articulate any cognizable irreparable harm." Joint App'x at 25. This appears to be based in part on the fact that "plaintiff's filings, some eight months after the acts complained of, raises the specter of delay." *Id.* We hold that Poor did articulate cognizable irreparable harm -- impairment of the employees' collective bargaining rights and the unionization process. *See Inn Credible Caterers*, 247 F.3d at 369. To the extent the district court denied relief based on filing delays, we also conclude that the Board's operative delay in these proceedings, without more, does not preclude a finding of irreparable harm.

The Supreme Court has noted that successorship situations place unions and employees "in a peculiarly vulnerable position." *Fall River Dyeing*, 482 U.S. at 39. "Given the uncertainties that both the union and its members face during the transition," courts have held that "a successor's refusal to recognize the union or . . . to hire a majority of the predecessor's employees so as to escape that obligation[] inflicts a particularly potent wound on the union and its members." *Bloedorn*, 276 F.3d at 298. To that end, this Court has recognized that

a successor's ability to hire a non-union workforce "[b]y its own violation of the Act" deprives the predecessor employees of their "ability to exercise their collective bargaining rights." *Inn Credible Caterers*, 247 F.3d at 369.

When deciding whether harm is irreparable in § 10(j) successorship cases like this one, we ask "whether the employees' collective bargaining rights may be undermined by the successor's unfair labor practices and whether any further delay may impair or undermine such bargaining in the future." *Id*. Put differently, the harm Poor must show is not injury to the specific *employees*, as Parking Systems suggests, but to "the unionization process." *Remington Lodging*, 773 F.3d at 469. Such harm is irreparable if the successor employer continues to delay or undermine the bargaining process while failing to reinstate the original employees, "because the process is unlikely to continue if former employees are replaced with a new workforce that is not inclined to unionize." *Id*.

Poor alleged that Parking Systems' actions would irreparably harm the "national policy protecting workers' right to unionize" and "the rights of [its] employees and former Classic employees." Joint App'x at 11-12. These injuries are clearly cognizable under our caselaw. Through its allegedly unlawful acts, Parking Systems managed to "weaken severely, if not destroy, the power of the

- 35 -

predecessor's employees to assert their collective bargaining rights." *Inn Credible Caterers*, 247 F.3d at 369. Classic's employees were deprived of their right to bargain through their chosen union, and became disillusioned with the Union as a result. *See* Joint App'x at 47 (Reyes testifying that her coworkers "lost their faith [i]n the Union" because "unions don't do[] nothing"); *id.* at 274-75 (Union agent Porsuk writing that the employees "expressed how upset they were that they were out of work only because they had a union" and that "the Union is powerless to do anything for them"). This is the exact kind of "damage [to] employee confidence" that could render "the Board's determination of any violations . . . meaningless in the context of a new majority workforce committed to non-unionization." *Inn Credible Caterers*, 247 F.3d at 369.

Poor's claim of irreparable harm is even more salient because, at the time of this writing, the Board lacks the quorum required to issue final, enforceable orders granting relief. *See Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (granting emergency application to block order reinstating Board member Gwynne Wilcox, whom President Trump fired upon taking office for his second term); *see also New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 683 (2010) (holding that a Board quorum is at least three members). Because the Board apparently

will not be able to issue an enforceable order from the appealed ALJ decision in this case at any time soon, *see id.*, Parking Systems will have even longer to hire a complete, non-unionized workforce "[b]y its own violation of the Act" in the absence of interim injunctive relief. *Inn Credible Caterers*, 247 F.3d at 369.

Parking Systems does not meaningfully contest Poor's allegations of injury, but instead argues that she has not demonstrated irreparable harm because of the Board's delay in seeking injunctive relief. At the outset, neither Parking Systems nor the district court focuses on the relevant period of delay. The alleged unfair labor practices took place around November 2023, and the Union filed its charge with the Board on December 4, 2023. Poor then spent several months investigating that charge before issuing a complaint on April 23, 2024 -- the earliest date on which she could have filed a § 10(j) petition. *See* 29 U.S.C. § 160(j) ("The Board shall have power, *upon issuance of a complaint . . .* , to petition any United States district court . . . for appropriate temporary relief or restraining order.") (emphasis added). Poor filed the petition for injunctive relief on October 7, 2024, around five and a half months later. Parking Systems calculated "10 months" of delay between the Union filing its charge and Poor filing her § 10(j) petition, *see* Appellee's Br. at 27; the district court calculated

"eight months" between the alleged unfair labor practices and Poor's issuance of a complaint, *see* Joint App'x at 25.  But the operative delay is the time between when Poor filed the complaint and was statutorily authorized to seek injunctive relief and when she actually filed the petition -- around five and a half months.

We note two considerations relevant to the question of delay.  First, this Court has "reject[ed] the notion that the passage of time, alone, is sufficient to justify rejecting a § 10(j) petition" where there is "evidence of ongoing interest in organizing that was being hindered by absence of discharged employees." *Remington Lodging*, 773 F.3d at 471.  Instead, the question is whether injunctive relief could still "restore the status quo as it existed prior to the unfair labor practices."  *Id.* at 471 (citing *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 141 (2d Cir. 2013)).  Second, as a practical matter, delays of this length between the filing of a complaint and petition are not uncommon in § 10(j) litigation.  *See, e.g., Amazon.com Servs.*, 104 F.4th at 438 (one-year delay between complaint and petition); *HealthBridge Mgmt.*, 732 F.3d at 136 (eighteen-month delay); *Hooks ex rel. NLRB. v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1109 (9th Cir. 2022) (seven-month delay); *Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d 534, 544 (4th Cir. 2009) (eighteen-month delay).  This is likely because a Regional Director must receive

authorization from the Board and its General Counsel before petitioning a district court for injunctive relief, a process that can understandably take several months. *See* 29 U.S.C. § 153(d); *see also HealthBridge Mgmt.*, 732 F.3d at 136-37 (explaining authorization process).

To be sure, excessive delay in seeking injunctive relief can undercut an argument of irreparable harm, especially when the employer has already remedied the alleged violations by the time relief is sought. In *Remington Lodging*, for example, we affirmed the district court's denial of a § 10(j) injunction after a four-month delay because by the time the petition was filed, the employer had offered reinstatement to all the discharged employees at their former salary and benefits, and "[n]othing indicate[d]" that the non-returning employees "would return if an injunction were issued." 773 F.3d at 470. But here, unlike in *Remington Lodging*, Parking Systems has not offered to reinstate all the former Classic employees. Although Parking Systems has re-hired eleven of them, there is no indication that they are receiving the salary and benefits they had under their CBA with Classic. The fact that the re-hired former employees have accepted offers to return in fact supports our conclusion that an injunction

requiring Parking Systems to reinstate the remaining employees and begin good faith bargaining could effectively restore the pre-violation status quo.

Accordingly, we hold that a five-month delay alone does not preclude a finding of irreparable harm where a predecessor's employees are ready and willing to return to their jobs under their bargained-for terms of employment.

### 3. Balance of the Equities and the Public Interest

In assessing these final factors, "courts must balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief," paying special attention to the "public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation modified). "[S]ection 10(j) should be applied in the public interest and not in vindication of purely private rights, so as to further the policies of the Act." *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) (citation modified).

Parking Systems argues that an interim reinstatement order is inequitable because Parking Systems will have to fire more than twenty employees currently working at Stony Brook. We are unpersuaded that such an

order would cause significant disruption to Parking Systems' operations given that it was initially eager to retain the former Classic employees, and has already re-hired eleven of them during the pendency of this case. Parking Systems managers were also adamant throughout the ALJ hearing that whenever Parking Systems loses an account, it will "always repurpose and reschedule those staff members" at other locations. Joint App'x at 62. And even if Parking Systems forgoes its practice of reassigning the twenty employees and fires them instead, "the rights of improperly discharged employees take priority over the rights of those hired to replace them." *Remington Lodging*, 773 F.3d at 469. All told, Parking Systems may not commit unlawful labor practices to hire a non-unionized workforce, and then argue that it is inequitable to order a restoration of the status quo before its violations.

Parking Systems also argues that its operations will be harmed by having to "implement terms and conditions of employment that are inconsistent with [its] mode of operating." Appellee's Br. at 53. This may be so. But insofar as Parking Systems' mode of operating runs afoul of labor law, the equities do not demand its preservation. And in any case, the requested injunction will be "temporally limited" because it only binds Parking Systems to the terms and

- 41 -

conditions of Classic's CBA until good faith negotiations are completed, "either to agreement or to impasse." *The Staten Island Hotel Ltd. P'ship*, 101 F.3d at 862. If this bargaining ultimately reaches an impasse, Parking Systems may then "implement unilateral changes in working conditions so long as the changes are reasonably comprehended within its pre-impasse proposals to the union." *Emhart Indus., Hartford Div. v. NLRB*, 907 F.2d 372, 376 (2d Cir. 1990).

Finally, granting injunctive relief in this case furthers the public policies of the Act. Ordering Parking Systems to reinstate Classic's employees under their bargained-for terms of employment during the pendency of the Board's proceedings advances the policy of settling labor disputes through collective bargaining, discourages successor employers from refusing to recognize and bargain with a pre-existing union, and safeguards the integrity of the collective bargaining process.

## *CONCLUSION*

For the reasons set forth above, we hold that the district court's order denying injunctive relief violates the requirements of Rule 52(a)(2). Because we further conclude that Poor has made a sufficient showing under all

four prongs of the *Winter* standard, the district court's decision is REVERSED

and the case is REMANDED for entry of the requested injunction.